155 F.3d 93
 82 A.F.T.R.2d 98-6113, 98-2 USTC P 50,667
 UNITED STATES of America, Third-Party-Plaintiff-Appellee,
v.
Robert LANDAU, Third-Party-Defendant-Appellant,
Nathan Unger, Plaintiff.
Nathan UNGER, Plaintiff-Appellee,
v.
Robert LANDAU, Third-Party-Defendant,
United States of America, Defendant-Appellant.
 Nos. 97-6139, 97-6165.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 26, 1998.
Decided Aug. 25, 1998.
 
 Jerome Kamerman, New York City (Kamerman & Soniker P.C., New York City, Michael J. Gerstein, New York City, of counsel), for Third-Party Defendant-Appellant Landau in No. 97-6139 and for Third-Party-Defendant Landau in No. 97-6165.
 Jeffrey Oestericher, Assistant United States Attorney, New York City, (Mary Jo White, United States Attorney for the Southern District of New York, Gideon A. Schor, Assistant United States Attorney, New York City, of counsel), for Third-Party-Plaintiff-Appellee United States of America in No. 97-6139 and for Defendant-Appellant United States of America in No. 97-6165.
 Wallace Musoff, New York City (Michael J. Coyle, Law Offices of Wallace Musoff, New York City, of counsel), for Plaintiff Unger in No. 97-6139 and for Plaintiff-Appellee Unger in No. 97-6165.
 Before: WINTER, Chief Judge, PARKER, Circuit Judge, and SCHWARZER, District Judge*
 PARKER, Circuit Judge:
 
 
 1
 This appeal concerns the assessment of tax penalties against Nathan Unger and Robert Landau under 26 U.S.C. § 6672 for the failure of their former employer, Robert Landau Associates ("RLA"), to remit withholding and Federal Insurance Contributions Act ("FICA") taxes to the United States Internal Revenue Service ("IRS" or "Government") as required under 26 U.S.C. § 7501(a). In 1987, the IRS made separate penalty assessments against Unger and Landau, and seized all of Unger's available assets. Unger brought an action seeking a refund; the IRS counterclaimed for the unpaid assessment and commenced a third-party action against Landau. The case was tried before a jury in the United States District Court for the Southern District of New York (Whitman Knapp, Senior Judge ), and the jury found Unger, but not Landau, personally liable for the unremitted taxes. Unger moved for a new trial and the Government moved for judgment as a matter of law against Landau. The district court set aside the jury verdict against Unger, sua sponte granted Unger judgment as a matter of law and directed the IRS to pay Unger $21,000 plus interest. The district court also set aside the jury verdict in Landau's favor, granting the Government's motion for judgment as a matter of law, and awarded the Government judgment against Landau in the sum of $1,046,376.30 plus statutory interest and additions accruing from the date of the assessment of the penalty. For the reasons stated below, we reverse and remand the judgment of the district court with respect to Unger, and affirm the judgment of the district court with respect to Landau.
 
 I. BACKGROUND
 A. Unger's and Landau's Duties at RLA
 
 2
 RLA, founded by Landau in 1975, was a marketing and advertising agency that provided promotional and sports licensing services to corporate clients. During the first three quarters of 1984 (the "Tax Period"), Landau was RLA's sole shareholder, President and Chief Executive Officer ("CEO") and Unger was Senior Vice President and Chief Financial Officer ("CFO"). Landau's salary was approximately $600,000 and Unger's was $100,000. During the Tax Period, RLA employed approximately two hundred people. Although primarily responsible for creative marketing and sales, Landau had supervisory authority over all RLA employees, including Unger.
 
 
 3
 Unger was first hired by RLA in March 1978 at the age of 22. He had a bachelor's degree in accounting from Queens College, but has never been a certified public accountant. He has never owned any shares in RLA. Unger's first position at RLA was as an assistant to the Controller. In January 1979, Unger was promoted to Controller, a position he held for approximately two years. He reported directly to Landau and was responsible for maintaining the company's books and supervising a staff of 4-5 employees. In this position, he had the power to hire and fire employees in his department. Between 1981 and 1983, Unger served as Vice President of Marketing Services. Unger was promoted to Senior Vice President and CFO in late 1983. He remained in that position until RLA declared bankruptcy on September 14, 1984.
 
 
 4
 As CFO, Unger was responsible for RLA's accounting and administrative functions and he reported directly to Landau. He signed documents with the title "Senior Vice-President." Unger had check-signing authority over all of RLA's accounts and signed checks to pay RLA's payroll, commercial creditors and withholding taxes. He had the authority to make transfers from RLA's bank accounts and was one of three people, including Landau, authorized to sign any and all documents without limitation, including leases, any financially related documents or any agreements with vendors or suppliers with total commitments in excess of $10,000.
 
 
 5
 Unger's claim, at trial and on appeal, is that his actual authority did not extend to the full extent of his technical authority. Unger became aware, in the beginning of 1984, that RLA was experiencing cash flow problems and was unable to pay all of its bills. During 1984, Unger spent most of his time talking with creditors and vendors regarding demands for payment. Unger was also aware that RLA was not meeting its withholding tax obligations, and he was informed by RLA's outside auditing firm that he could be personally liable for the unpaid taxes. Unger maintains that he would draw up a list of creditors on a weekly basis and present the list to Landau. The tax delinquencies were at the top of the list. However, Unger claims that Landau directed him to pay other creditors first, and Landau assured him that he would soon obtain enough new business to enable RLA to pay off its tax liabilities. Unger followed Landau's instructions.
 
 
 6
 On April 26, 1984, RLA filed its Employer's Quarterly Federal Income Tax Return on Form 941 ("941 Return") for the first quarter of 1984 showing a total amount due for that period of $568,340.17 for withheld income and FICA taxes. RLA paid $101,711.58. On July 26, 1984, RLA filed its 941 Return for the second quarter of 1984 showing withholding taxes due for the period in the amount of $490,251.47, none of which was paid. In November 1984, RLA filed its 941 Return for the third quarter of 1984 showing withholding taxes due for the period in the amount of $289,242.33. The total amount of the delinquency was $1,046,376.30.
 
 
 7
 B. Landau's Drug and Alcohol Addiction and His Activities during the Tax Period
 
 
 8
 By the spring of 1983, Landau had become totally addicted to cocaine. Shortly thereafter, Unger was promoted to CFO and Landau gave Unger power of attorney so that Unger could write checks on Landau's personal bank account in order to pay Landau's personal bills. In December 1983, Landau began consuming alcohol in addition to the cocaine. In late May 1984, Landau voluntarily entered a drug rehabilitation hospital, but left after a few days with his addiction uncured. He continued to ingest daily six to eight grams of cocaine and a quart of alcohol. After RLA was declared bankrupt, Landau plead guilty to wire and mail fraud charges.
 
 
 9
 As CEO, Landau could sign checks, determine the order in which bills would be paid and negotiate contracts. According to the Government, Landau was aware by the end of 1983 that RLA was experiencing cash flow problems. Landau obtained a $2.3 million bank loan in January 1984, which was secured by the assets of RLA and Landau's personal real estate holdings, and subsequently called major clients to inform them of the material change in the company's finances. He also negotiated a termination of a major contract which had caused RLA to suffer substantial losses. In February 1984, Landau took a business trip to Sarajevo to oversee RLA's promotion work at the Winter Olympics taking place there. While in Sarajevo, Landau hosted dinner parties, entertained clients and escorted clients to events. In June 1984, Landau landed a major account as marketing representative for the U.S. Olympic Committee, with exclusive responsibility for licensing commercial use of all Olympic-related symbols and marks through the 1988 games.
 
 
 10
 Landau was told by at least June or July of 1984 that RLA was delinquent with respect to its withholding tax obligations. Also in July 1984, Landau negotiated the sale of his partnership interest in certain race horses and put the proceeds into RLA. At the end of July, Landau took a business trip to the Summer Olympics in Los Angeles and tried, unsuccessfully, to raise money.
 
 C. Pre-trial Proceedings
 
 11
 On or about November 23, 1987, the IRS made separate 100% penalty assessments against Unger and Landau each in the amount of $1,046,376.30, based on their alleged failure to cause RLA to remit its withholding taxes to the IRS for the Tax Period. With respect to Unger, the Government actually seized all his available assets totalling $20,500. Unger paid an administrative fee of $500 for filing a claim for a refund, and on or about January 22, 1990, commenced an action against the Government demanding that the penalty assessed against him be abated and that the district court order the Government to refund the monies it had collected from him based on that assessment. On June 20, 1990, the Government answered Unger's complaint and filed a counterclaim requesting judgment for the unpaid balance of the assessment against Unger plus statutory interest accrued thereon. On June 21, 1990, the Government commenced a third-party action against Landau to reduce to a judgment the penalty assessment against him plus accrued interest.
 
 
 12
 In February 1993, the Government moved for summary judgment on its counterclaim against Unger and third-party complaint against Landau, and to dismiss Unger's complaint. On February 17, 1994, the district court granted the Government's motion in full. The court found that Unger was a "responsible person" within the meaning of § 6672, and held that Unger's "assertion that he did not subjectively believe that he had the authority to sign checks to the Government without Landau's consent [was], under Hochstein [v. United States, 900 F.2d 543 (2d Cir.1990) ], irrelevant." The district court so held notwithstanding its view that the application of the Hochstein decision in this case was unjust. With respect to Landau, the district court held that Landau was a "responsible person," rejecting the argument that Landau's substance abuse during the Tax Period rendered him unable to exercise his authority. The court further held that Landau's voluntary intoxication was no defense to § 6672's willfulness requirement.
 
 
 13
 On or about March 3, 1994, Landau filed a motion for reconsideration of the district court's summary judgement decision, arguing that there was credible evidence to support the conclusion that Landau did not understand what he was doing and therefore did not act willfully. The district court granted the motion on the ground that the court "may have erred in [its] conclusion that [its] own interpretation of the medical evidence ... is the only possible reasonable interpretation."[1]
 
 
 14
 On or about February 26, 1996, Unger moved to vacate the district court's February 17, 1994 order granting the Government's motion for summary judgment against Unger in light of the intervening decision by this Court in United States v. Rem, 38 F.3d 634 (2d Cir.1994). On May 14, 1996, the district court granted Unger's motion and denied the Government's motion for summary judgment against Unger. Accordingly, the case proceeded to trial.D. Jury Trial and Verdict
 
 
 15
 The trial took place over seven days beginning on December 9, 1996. Landau called seven witnesses to testify: himself, his wife, Eugene Lewis, Landau's close friend and business colleague, and four doctors who had observed Landau during the Tax Period. Unger was the only witness to testify on his behalf, and he did not introduce any exhibits into evidence. The Government did not call any witnesses, but submitted a substantial amount of documentary evidence. Briefly stated, the testimony was as follows.
 
 
 16
 Ross Brower, M.D., Landau's principal treating physician during the Tax Period, testified that during the period Landau was ingesting cocaine, he was paranoid, anxious, "totally out of control of his mood behavior and thinking" and was "not thinking rationally." He also testified that quantities of half a gram of cocaine is sufficient on a daily basis to impair judgment, thinking ability and memory. On cross-examination, however, Dr. Bower conceded that it was consistent with his diagnosis that Landau could have negotiated contracts, attended business meetings and obtained financing during this period. Dr. Bower further testified that Landau had told him of his concern for his business, its cash-flow problems and how RLA was going to pay its bills and employees. He was aware that he owed people money and that if he could not pay them, serious consequences would result.
 
 
 17
 Allen Chodock, M.D., another physician who treated Landau, testified that during 1984 Landau was "rambling" and often incoherent and illogical "in his mannerisms and thought process." Dr. Chodock also testified that he visited RLA and suggested to Unger that it would be in Unger's best interest to find a job elsewhere if Landau could not "kick his habit." Dr. Chodock agreed, however, that when he visited RLA, Landau knew he was the boss of the company and acted like he was the boss of the company and did not exhibit bizarre behavior.
 
 
 18
 Eugene Lewis, RLA's Vice President and Assistant to Landau, testified that Landau would often not come into the office, and when he did, he came in late in jeans and a T-shirt. He would call meetings immediately, appeared chaotic, and forgot what people told him. According to Lewis, Landau did not act as the boss. During the Tax Period, Landau would often give direct instructions that were inappropriate and his subordinates would try to ignore them. Landau testified that he would come into the office at 7 or 8 p.m. and would be presented with a stack of papers which he signed without reading them. Landau also testified that he recalled attending a meeting in June 1984 in which RLA's delinquent tax obligation was discussed, following which he directed RLA's Executive Vice President, Charles Lockwood, and Unger to pay the delinquent taxes.
 
 
 19
 With respect to Unger, the district judge instructed the jury that he would only have a defense to liability if he actually believed that his authority extended only to signing those checks Landau directed him to sign, and if that belief was reasonable under the circumstances. As to Landau, the district court informed the jury of Landau's contention that his drug and alcohol addiction prevented him from being able to participate in the decisions of the company and from being aware of the fact that the taxes were not being paid, but instructed them that Landau only had a defense to liability under § 6672 if his addiction meant that "he didn't know and couldn't know what he was doing and had no capacity to remember."
 
 
 20
 On December 19, 1996, the jury returned a verdict in the Government's favor as to Unger, and against the Government with respect to Landau. Specifically, the jury answered "yes" to the question whether Unger had "significant control" over the corporation's finances to cause the withheld payroll taxes to be paid to the IRS for the first three quarters of 1984. The jury found that Landau was not "able to effectively exercise significant control over the corporation's finances to cause the withheld taxes to be paid" for the first three quarters of 1984. In answer to question of whether Landau "consciously [knew] ... that the withheld payroll taxes that were owed to the government had not been remitted," the jury stated "yes" for the third quarter of 1984, and "no" for the first two quarters of 1984.E. Post-Trial Motions
 
 
 21
 On or about December 24, 1996, the Government moved for judgment as a matter of law against Landau pursuant to Fed.R.Civ.P. 50(b). On or about January 21, 1997, Unger moved for judgment as a matter of law on the ground that the assessment against him was untimely, or alternatively, for a new trial on the grounds that the jury verdict against him was manifestly against the weight of the evidence and that he was unfairly prejudiced by having his case tried together with Landau's. On March 17, 1997, the district court issued two separate opinions setting aside both jury verdicts, sua sponte granting Unger judgment as a matter of law, and granting the Government's motion for judgment as a matter of law as against Landau.
 
 
 22
 F. The March 17, 1994 Decisions of the District Court
 
 
 23
 In setting aside Unger's jury verdict, the district court analyzed this Court's decision in Rem and the evidence at trial. According to the district court, "the controlling questions in the case ... [were]: (1) whether or not Unger--regardless of the plethora of formal documentation--firmly believed that his actual authority was limited to following Landau's orders; and if so (2) was such belief reasonable in all the circumstances." Unger v. United States, 956 F.Supp. 1152, 1156 (S.D.N.Y.1997). The court found "irrelevant any documents defining Unger's 'technical authority or titular designation.' " Id. Upon reviewing the evidence at trial, the court found that "the entirety of Unger's testimony establish[ed] beyond peradventure that Unger firmly believed that his actual authority was limited to following Landau's orders and that such belief was reasonable." Id. at 1157. The court found no evidence in the record which would "provide a reasonable basis for rejecting that testimony," and accordingly the Rem decision required the jury's verdict to be set aside. The court explained:
 
 
 24
 In brief, Unger's testimony convincingly established a prima facie case. After three years of discovery before bringing its motion for summary judgment, during which time it had available to it every bit of documentary evidence that had been in RLA's possession and the ability to interview and/or depose any relevant person who had either worked for or done business with RLA, the Government was not able to come up with a scintilla of evidence that would authorize a jury to reject Unger's testimony. This, coupled with the conclusions resulting from our study of the record, inevitably leads to a finding that the jury's apparent rejection of Unger's testimony was based on sheer surmise and conjecture. Accordingly, allowing its verdict to stand would result in manifest injustice.
 
 
 25
 956 F.Supp. at 1158.
 
 
 26
 In the court's view, two factors led the jury astray: "(1) the Government's total misunderstanding of the Rem decision, and (2) the fact that Unger was called upon to testify in 1996 concerning events that had occurred in 1984." Id. As to the first, the court restated that Rem held that "documents defining Unger's 'technical authority or titular designation' " were irrelevant. Id. Yet the Government "persistently cross-examined Unger as though each one of the irrelevant documents somehow refuted what he was saying." Id. Second, the district court thought that Unger's evasive responses to the Government's presentation of endless checks that Unger had signed during the Tax Period "might well have persuaded the jury that Unger was either stonewalling or lying." Id. at 1159.
 
 
 27
 Rather than granting a new trial, as Unger had requested, the district court sua sponte granted a final judgment in the case, to "bring this seemingly interminable litigation to an end." 956 F.Supp. at 1159. In the court's view, the Government had no "unused evidence which might support a just verdict against Unger" so as to justify a new trial. Id.
 
 
 28
 With respect to Landau, the district court granted the Government's motion pursuant to Rule 50(b) for judgment as a matter of law against Landau on the ground that intoxication cannot as a matter of law be a defense to liability under § 6672. See United States v. Landau, 956 F.Supp. 1160, 1162 (S.D.N.Y.1997). Analogizing to criminal law, and the principle that voluntary intoxication is a defense to specific but not general intent crimes, the court reasoned that "if a civil statute does not require proof of specific intent then voluntary intoxication may not be a valid defense." Id. at 1162. The court below analyzed this Court's precedent on § 6672 and found that "willfulness" under that section requires only that the Government prove that an individual acted "voluntarily, knowingly, consciously and intentionally, as opposed to accidentally or mistakenly." Id. The Government was not required to prove "bad purpose or evil motive" in failing to collect and pay the taxes. Id. Thus, the district court reasoned, "liability under Section 6672 [does not] require[ ] a finding of specific intent." Id. Accordingly, the court concluded that Landau's addiction to alcohol and cocaine could not as a matter of law negate the conclusion that he was a responsible person during the Tax Period or that he willfully failed to remit the taxes to the IRS.
 
 
 29
 The Government and Landau timely appealed.
 
 II. DISCUSSION
 A. Standard of Review
 
 30
 We review a district court's grant of a motion for judgment as a matter of law de novo. See United States v. One Parcel of Property Located at 121 Allen Place, Hartford, Conn., 75 F.3d 118, 121 (2d Cir.1996). This Court has held:
 
 
 31
 In ruling on a motion for judgment n.o.v. [now judgment as a matter of law under Fed.R.Civ.P. 50(b) ], the district court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury.
 
 
 32
 Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 367 (2d Cir.1988) (quotation marks and citations omitted); see LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir.1995). The district court may properly grant the motion "[o]nly if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [the moving party]." LeBlanc, 67 F.3d at 429 (quotation marks omitted). "The same standard governs appellate review of a decision granting or denying judgment as a matter of law." Id.
 
 B. The Requirements of Section 6672
 Section 6672 provides, in relevant part:
 
 33
 Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.
 
 
 34
 26 U.S.C. § 6672(a). "It is well established that the statute requires two elements to be present before personal liability for unpaid withholding taxes attaches: first, the individual must be a person responsible for the collection and payment of withholding taxes, i.e., he must have the authority to direct the payment of corporate funds; second, the individual's failure to comply with the statute must be willful." Hochstein, 900 F.2d at 546.
 
 
 35
 "More than one individual may be a responsible person within the meaning of § 6672(a)." Rem, 38 F.3d at 642. See also Fiataruolo v. United States, 8 F.3d 930, 939 (2d Cir.1993). The test for whether an individual is a responsible person turns on " 'whether the individual has significant control over the enterprise's finances.' " Fiataruolo, 8 F.3d at 939 (quoting Hochstein, 900 F.2d at 547) (emphasis omitted). A number of factors are considered, including
 
 
 36
 whether the person: (1) is an officer or member of the board of directors, (2) owns shares or possesses an entrepreneurial stake in the company, (3) is active in the management of the day-to-day affairs of the company, (4) has the ability to hire and fire employees, (5) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid, (6) exercises control over daily bank accounts and disbursement records, and (7) has check-signing authority.
 
 
 37
 Fiataruolo, 8 F.3d at 939; Hochstein, 900 F.2d at 547. "The question of control ... must be answered in light of the totality of the circumstances; no one factor is determinative." Fiataruolo, 8 F.3d at 939.
 
 
 38
 "[T]o be held responsible under § 6672 a person need not have the final word on which creditors are to be paid or how funds are to be allocated. At the same time, the significant control test is not meant to ensnare those who have merely technical authority or titular designation." Fiataruolo, 8 F.3d at 939. Accordingly, if an individual who possesses all the hallmarks of "significant control" can nevertheless establish that he or she did not exercise significant control as a matter of fact, the individual will not be a "responsible person" within the meaning of § 6672.
 
 
 39
 The second requirement for personal liability under the statute is that the individual's failure to collect, account for, or remit the holding taxes must be "willful[ ]." 26 U.S.C. § 6672(a). "A person willfully fails to pay withholding taxes within the meaning of section 6672 when he pays other creditors with knowledge that withholding taxes are due." Hochstein, 900 F.2d at 548. See Rem, 38 F.3d at 643 ("The principal components of willfulness is knowledge: a responsible person acted willfully within the meaning of § 6672(a) if he (a) knew of the company's obligation to pay withholding taxes, and (b) knew that company funds were being used for other purposes instead"). "Conduct amounting to no more than negligence is not willful for purposes of § 6672," but it is not necessary to prove "evil motive or intent to defraud." Kalb v. United States, 505 F.2d 506, 511 (2d Cir.1974). Willful action has been defined as " 'voluntary, conscious and intentional--as opposed to accidental--decisions not to remit funds properly withheld to the Government.' " Id. Willful conduct may also include a "reckless disregard for obvious and known risks" as well as a "failure to investigate ... after having notice that withholding taxes have not been remitted to the Government." Id. (quotation marks and citations omitted).
 
 
 40
 An individual against whom the IRS has made a § 6672(a) assessment has the burden of proving by a preponderance of evidence that one or both of the elements of liability under that section is absent. See Rem, 38 F.3d at 643 (citing Lesser v. United States, 368 F.2d 306, 310 (2d Cir.1966) (in banc)).
 
 
 41
 C. Applying These Principles in Unger's Case
 
 
 42
 Since Unger conceded at trial, as he does on appeal, that he knew that RLA was not fulfilling its withholding tax obligations and that other creditors were being paid in preference to the Government, there is no dispute about whether Unger was "willful" within the meaning of the statute. The only issue is whether Unger was a "responsible person" in light of his defense that he had no "effective authority to direct payment of corporate funds" and his claim that his "role was limited to acting as a mere scribe implementing the directions of Landau, the sole shareholder of RLA."
 
 
 43
 At the summary judgment stage, this case appeared to be on all fours with Rem. Rem joined a company run by his mother and father in 1977, having worked for a couple of years as a management consultant for banking and accounting firms. Rem later acquired 20% of the company's stock. Rem had a variety of corporate titles from 1977 until the company ceased operation in 1981. He was assigned the responsibility of conducting credit negotiations, and represented to various creditors that he was the company's president. Rem had signed checks for the company and had also signed at least one credit agreement as "President and Secretary." 38 F.3d at 637.
 
 
 44
 Rem knew that withholding taxes were required to be paid and that other creditors were being paid instead. Rem argued, however, that he had no actual control or position of responsibility with respect to the corporation's finances because it was his mother who decided what commercial creditors should be paid and she forbade him to pay the taxes. We held that while "[s]ome of the Fiataruolo /Hochstein factors were undeniably present," 38 F.3d at 644, there was a genuine issue of material fact as to whether Rem in fact had significant control over the company's finances so as to be a "responsible person" within the meaning of § 6672. Id. at 645. The Court stated:
 
 
 45
 [S]ince § 6672 was not meant to ensnare those who have merely a titular designation, Rem's contention that his title of president was spurious, being merely a device to induce commercial or financial organizations to grant the company credit, required a probing of the substance of that title, and we conclude that the district court's analysis did not view the evidence in the light most favorable to Rem.
 
 
 46
 Id. See also 38 F.3d at 647 (Leval, J., concurring) ("The power to sign checks and the holding of corporate office are indeed factors that courts have listed as helpful in deciding whether an individual possessed the necessary power, but they are only factors. Either can exist in circumstances where the individual in reality does not possess significant control over corporate finances. When this is so, the potentially devastating 'responsible person' liability should not be imposed").
 
 
 47
 In this case, as in Rem, some of the "Fiataruolo /Hochstein " factors were present: Unger was an officer (indeed Senior Vice President and CFO) of RLA, he dealt with creditors and vendors on a daily basis, he had check-signing authority and in fact signed checks for the company, and he signed documents as "Senior Vice President." Also like Rem, Unger claims that despite his "technical authority," he had no significant control or discretion to disburse corporate funds in reality. The crucial difference between Rem and this case, however, is its procedural posture. In Rem, the district court had decided on a summary judgment motion what the Court of Appeals held to be essentially a factual question that should have been left to the jury: whether, despite Rem's technical authority, he actually exercised significant control or merely followed the orders of his superiors. Indeed, the Court in Rem specifically noted that "a trier of fact may well reach the same evaluation" as did the district court in that case, but that "the weighing of the evidence and the assessment of credibility were not appropriate for the determination of a summary judgment motion." 38 F.3d at 645. In this case, by contrast, the jury has decided the very factual question at issue in Rem. The jury was instructed to consider Unger's actual authority in determining whether Unger possessed "significant control," and found against him. Accordingly, in considering whether to set aside the verdict and grant judgment as a matter of law for Unger, the only question for the district court (assuming the jury was properly instructed) was whether, considering the evidence in the light most favorable to the Government, and drawing all reasonable inferences that the jury might have drawn in the Government's favor, there was "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." LeBlanc, 67 F.3d at 429 (quotation marks omitted). In our view, the district court did not adhere to this strict standard in granting Unger judgment as a matter of law.
 
 
 48
 The district court rejected the jury verdict by a two-step process. First, the district court considered "the entirety of Unger's testimony" and concluded that Unger believed that "his actual authority was limited to following Landau's orders and that such belief was reasonable." 956 F.Supp. at 1157. This first step involves, in our view, an impermissible assessment of the credibility of a witness. Second, the district court concluded that there was no evidence in the record that would authorize the jury to reject Unger's testimony. In reaching this conclusion, the district court both weighed the evidence and failed to consider the evidence in the light most favorable to the Government, contrary to the standard set forth in LeBlanc. The court discounted the testimony of Eugene Lewis that Unger did in fact make decisions regarding whether bills should be paid, on the basis that Lewis conceded he was not privy to any understanding that may have existed between Unger and Landau with respect to Unger's check-signing authority. 956 F.Supp. at 1157. In our view, the jury could reasonably have drawn an inference from this evidence, along with other evidence in the case, that Unger did in fact exercise significant control over the corporation's finances. That other evidence included the testimony of Lewis to the effect that Landau was ignored by his subordinates, did not act as a boss, and turned up to work only sporadically. Additionally, there was conflicting evidence as to whether Unger was aware of Landau's addiction and the extent to which Landau was incoherent. As the Government points out on appeal, RLA earned $30 million a year, employed some two hundred people, and issued thousands of checks during the Tax Period. The jury may well have concluded that a company of that size simply could not function if every check above a nominal amount had to be approved by Landau, especially in light Landau's absence from the office.
 
 
 49
 The district court also relied on the fact that the evidence "gave no clue as to Landau's motive in investing Unger" with the significant powers he possessed as Senior Vice President and CFO. 956 F.Supp. at 1156. In the district court's view, Landau may have cunningly placed Unger, a person whom he trusted yet a person with limited business experience, in a position of significant power within the company, so that he would have in place someone who would simply follow his wishes. Id. However, the district court's view as to the inferences to be drawn from holes in the evidence may not be substituted for the jury's assessment of the evidence. Moreover, to the extent that the evidence was deficient in this respect, it must be remembered that it was Unger's burden to establish by a preponderance of the evidence that he did not in fact exercise significant control over the corporation's finances. Similarly, the district court's conclusion that despite three years of discovery, "the Government was not able to come up with a scintilla of evidence that would authorize a jury to reject Unger's testimony" fails to recognize that it was not the Government's burden to disprove significant control.
 
 
 50
 Underlying much of the district court's analysis was the proposition that the documentary evidence submitted by the government which indicated Unger's "technical authority" was "irrelevant" under Rem. This statement is incorrect. Such evidence will in most cases suffice to establish an individual's significant control over a company's finances. In a case where, as in Rem and as here, the individual's defense is that he or she was "barred by the orders of a superior from paying the taxes," Rem, 38 F.3d at 647 (Leval, J., concurring), that is, the individual did not effectively exercise control despite the outward appearances of authority, such documentary evidence may be irrelevant as to whether the individual in fact possessed the authority that the company's documents indicates the individual had. However, it remains the individual's burden to show that actual authority was in reality more limited than technical authority, and if the individual fails to meet that burden, a trier of fact may reasonably conclude that the documentary evidence of authority reflects the reality.
 
 
 51
 In sum, considering the evidence in the light most favorable to the Government and giving the Government the benefit of all reasonable inferences that the jury might have drawn, without assessing the weight of the evidence or passing on the credibility of the witnesses, we hold that the jury could have found that Unger failed to establish by a preponderance of the evidence that he did not actually possess significant control over the company's finances. Accordingly, the district court erred in granting Unger judgment as a matter of law. For this reason, we reverse the decision of the district court. We note that the Government also argues that the district court applied the incorrect standard for determining whether Unger was a responsible person under § 6672. According to the Government, neither Unger's actual belief nor the reasonableness of that belief are relevant to the responsible person test under Rem and Hochstein. In holding that an individual has a defense if he or she can establish that she did not exercise significant control in fact, the court in Rem did not formulate any test for making that determination; nor did the court indicate to what extent subjective as opposed to objective considerations are relevant.[2] However, we decline to decide whether Judge Knapp's formulation was exactly consistent with the "responsible person" test under Rem because we find that the government waived the issue when it failed to object to a jury instruction in the same terms.
 
 
 52
 1. Should Unger Be Granted a New Trial?
 
 
 53
 Unger argues that if this Court determines that the district court improperly granted judgment as a matter of law, the Court should nevertheless remand the case to the district court for a new trial. Although Unger moved for a new trial and in fact "specifically abjured requesting a final judgment," Unger, 956 F.Supp. at 1159, the district court failed to make, contrary to Fed.R.Civ.P. 50(c), an alternative ruling on the new trial motion once it had sua sponte granted Unger judgment as a matter of law. Accordingly, we must determine whether the case should be remanded to the district court either for a new trial or for the purpose of ruling on the new trial motion.
 
 
 54
 This Circuit has stated that "[a] less stringent standard applies to a motion for a new trial." Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970 (2d Cir.1987). A district court should grant a new trial motion if it "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 370 (2d Cir.1988). Unlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict. See Bevevino v. Saydjari, 574 F.2d 676, 683 (2d Cir.1978); Song v. Ives Laboratories, Inc., 957 F.2d 1041, 1047 (2d Cir.1992); see also 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2806, at 65 (2d ed.1995). Also unlike a motion for judgment as a matter of law, a trial judge considering a motion for a new trial "is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner." Bevevino, 574 F.2d at 684. In view of the fact that the district court is in a "unique position to assess the credibility of the witnesses and to determine the weight which should be accorded their testimony," Song, 957 F.2d at 1047, we decline to sit in the place of the district judge in deciding whether Unger's new trial motion should be granted. Thus, the only question is whether we should remand the case to the district court to make that determination.
 
 
 55
 The Government argues that Unger should not receive a new trial because the jury verdict was, in the Government's words, "based in part on its evaluation of Unger's credibility," and was fully supported by the evidence. The Government cites to Sorlucco v. New York City Police Dep't, 971 F.2d 864, 875 (2d Cir.1992), where this Court reversed a trial judge's grant of a new trial because the "trial court [had] overstepped its bounds and usurped the jury's function of judging credibility." Id.
 
 
 56
 The Government's claim that a trial judge may never grant a new trial where the jury's verdict is supported by the evidence is misguided. As stated above, the trial judge may overturn a jury's verdict, even where there is "substantial evidence" to support it, if the trial judge concludes, based on the weight of the evidence, that the verdict was seriously erroneous or the result was a miscarriage of justice. See Bevevino, 574 F.2d at 684-85. Further, the fact that the jury's verdict was, as the Government contends, "based in part on its evaluation of Unger's credibility" does not preclude the district judge's grant of a new trial. It is inherent in the proposition that the district judge may weigh the evidence that the judge will consider the credibility of witnesses. See Song, 957 F.2d at 1047 (upholding grant of new trial in wrongful termination case where the evidence of unsatisfactory job performance "rested almost entirely on the testimony of [appellant's] co-workers regarding his allegedly poor inter-personal skills and professional relationships"). This is not to say that a district judge may freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury. See Bevevino, 574 F.2d at 685. A jury's credibility assessments are entitled to deference, see Tennant v. Peoria & Pakin Union Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944), and we have stated that "[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." Metromedia Co. v. Fugazy, 983 F.2d 350, 363 (2d Cir.1992). However, these principles of deference to the jury do not override the trial judge's duty to "see that there is no miscarriage of justice." Bevevino, 574 F.2d at 684 (quoting 6A Moore's Federal Practice, p 59.08(5), at 59-160 to 59-161 (1973)). "If convinced that there has been [a miscarriage of justice] then it is [the trial judge's] duty to set the verdict aside...." Id.
 
 
 57
 We do not believe that Sorlucco, on which the government relies, forecloses the possibility of the new trial standard being met in this case. Sorlucco, a former probationary police officer with the New York City Police Department ("NYPD"), brought an action alleging, inter alia, that the NYPD had terminated her on the basis of gender in violation of 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Sorlucco had been sexually assaulted by a fellow male officer, but failed to report the incident immediately, and then failed initially to implicate her true attacker, claiming at trial that she feared retaliatory conduct by him. Sorlucco was placed on modified assignment and subsequently terminated for falsely stating, at the time she filed the incident report, that she did not know the man who had raped her. (She disclosed his identity four days later). Her attacker, however, was never placed on any kind of restricted duty or otherwise disciplined, nor was there "any meaningful investigation into [his] conduct." 971 F.2d at 873. At trial, Sorlucco presented facts concerning her treatment by the NYPD and the results of a NYPD study regarding the suspension and termination of probationary officers which indicated discriminatory treatment by the NYPD. The jury returned a verdict in favor of Sorlucco.
 
 
 58
 The district court granted NYPD's alternative motion for a new trial on the grounds that Sorlucco likely perjured herself. The contradictory evidence from which the court drew the conclusion that Sorlucco was lying was placed before the jury. The district court recognized at trial that the veracity of Sorlucco's testimony on the particular issue was a " 'straight credibility issue for the jury.' " 971 F.2d at 875. On appeal, this Court found that, in later granting the new trial motion, "the judge gave no reason for his change of mind." Id. Reversing the grant of a new trial, we stated that the district court had "overstepped its bounds and usurped the jury's function of judging credibility." Id.
 
 
 59
 Sorlucco illustrates the tension that exists when granting a motion for a new trial between two conflicting principles: the parties' Seventh Amendment right to a trial by jury and the power of the district court, also necessary to our jury system, to set aside a seriously erroneous verdict based on the weight of the evidence.[3] This tension is most acute where, as in this case[4] and in Sorlucco, the result may turn in large part on the credibility of a single witness. While this makes the trial court's task in ruling on a new trial motion more difficult, it does not preclude the possibility that the motion may be granted. In Sorlucco, the Court of Appeals found that the trial judge had disagreed with the jury on the credibility of a key witness but did not explain how that difference of opinion lead to a miscarriage of justice. We do not read Sorlucco to mean that a trial judge can never substitute its view of the evidence for that of the jury, provided the judge is "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Smith, 861 F.2d at 370. Indeed, the court in Sorlucco reiterated this principle and there is no suggestion in the opinion that the panel was setting a new standard or altering, sub silentio, the well-established principles for granting a new trial set forth above. Accordingly, we remand the case to the district court to determine whether Unger's motion for a new trial should be granted.
 
 
 60
 D. Application of These Principles to Landau
 
 
 61
 Landau contends that his drug and alcohol addiction negated both prongs of § 6672 liability. According to Landau, he could not have been a "responsible person" because he lacked effective control due to his compulsive and excessive use of cocaine and alcohol, and even if he was a "responsible person," he could not be regarded as having willfully failed to remit the taxes because his substance abuse had such a severe effect on him that he could not know that the taxes were unpaid. For the reasons that follow, we reject both of these claims.
 
 
 62
 We agree with the district court that voluntary intoxication cannot be a defense to responsible person liability under § 6672 in the circumstances of this case. Employers are required to withhold federal income and social security taxes from their employees' wages. These sums are held "in trust" for the government. See 26 U.S.C. § 7501(a). An employer that fails to remit the taxes is liable to the government, but the government has no recourse against the employee. Congress enacted § 6672 to protect the government from losing these "trust funds" by providing alternate sources from which to collect the withheld taxes. See Fiataruolo, 8 F.3d at 938; Rem, 38 F.3d at 646. To permit the CEO and owner of a company, the person with the ultimate authority over the company's financial affairs, to escape liability by claiming that he or she was so addicted to cocaine and alcohol as to lack significant control in fact would defeat the purpose of the statute. This is particularly true on the facts of this case, where throughout the Tax Period Landau continued to act as CEO and to draw down a salary of over half a million dollars, while exposing his subordinates (who earned much less) to a personal liability for the withheld taxes in an amount of over $1 million.
 
 
 63
 Similarly, we hold that an individual's drug addiction does not preclude a finding that an individual willfully failed to remit the withholding taxes, at least where that individual is the CEO and owner of the company. Although this issue does not appear to have been addressed in the context of § 6672, we note that in analogous bankruptcy cases, courts have refused to recognize drug addiction as a defense to liability. See, e.g., In re Berzon, 145 B.R. 247, 251 (Bankr.N.D.Ill.1992) (holding that debtor's cocaine habit did not preclude a finding that he willfully failed to file tax returns); In re Correa, 58 B.R. 88 (Bankr.N.D.Ill.1986) (holding that debtor's failure to attend creditors' meeting and failure to disclose certain information constituted a willful failure to abide by court orders despite cocaine addiction).
 
 
 64
 Landau argues that drug addiction is analogous to incapacitation due to physical illness, and that such incapacitation has been held to be a defense to § 6672 liability. See Young v. United States, 609 F.Supp. 512, 518 (N.D.Tex.1985) (holding that the degree to which a stroke affected the ability of the president of the corporation to understand and participate in the affairs of the corporation during the relevant time period was a question for the jury); see also Sherwood v. United States, 246 F.Supp. 502, 508 (E.D.N.Y.1965) (finding that the president and CEO had no duty to pay taxes under § 6672 during period of incapacitation due to illness and that, even if he had such a duty, his failure to pay was not willful). We disagree. Even if, as Landau claims, his addiction prevented him from exercising his authority, or understanding that the taxes were due, his addiction does not justify or excuse his failure to remit the taxes because it flowed from a voluntary decision to use narcotics and alcohol.
 
 
 65
 Although we are in agreement with the district court that voluntary intoxication is no defense to § 6672 liability in this case, we note that we find some of the lower court's reasoning troubling. In particular, we do not believe that it is helpful to draw an analogy to criminal law. It is somewhat confusing, in our view, to rely on general criminal law principles as to general and specific intent crimes when this Court has specifically held that "willful" conduct under § 6672 is not the same as "willful" conduct in the criminal context. See Gerald B. Lefcourt, P.C. v. United States, 125 F.3d 79, 82-83 (2d Cir.1997) (holding that Cheek v. United States, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), where the Supreme Court held that "willful" in a criminal tax penalty statute required the government to prove specific intent to violate the law, did not apply where the taxpayer faced only a civil penalty). It is well established in this Circuit that "willful" in § 6672 describes conduct that is "voluntary, conscious and intentional--as opposed to accidental" and does not require an evil motive or intent to defraud. Rem, 38 F.3d at 643. Accordingly, we decline to muddy the waters by importing any criminal notions of specific or general intent into § 6672 for the purpose of determining whether the defense of voluntary intoxication is available under § 6672. We simply hold, as a matter of policy, that it is not.
 
 
 66
 E. Unger and Landau's Statute of Limitations Defense
 
 
 67
 Unger and Landau argue that § 6501(a) of the Internal Revenue Code provides a three year statute of limitations for assessing a penalty pursuant to § 6672 and that the tax returns in this case were filed beyond the three year period. See 26 U.S.C. § 6501(a). The assessment of the penalty was made on November 23, 1987, and the tax returns were filed in April, July and October 1984, for the quarters ended March 30, June 30 and September 30, 1984 respectively.
 
 
 68
 We hold that both Unger and Landau have waived any possible statute of limitations defense. "A claim that a statute of limitations bars a suit is an affirmative defense, and, as such, it is waived if not raised in the answer to the complaint." Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 967 F.2d 742, 751-52 (2d Cir.1992) (citing Fed.R.Civ.P. 8(c)). Unger and Landau first raised the defense on October 18, 1994, when they moved for summary judgment on the ground that the Government's assessment against each of them was beyond the applicable statute of limitations. However, the district court had already ruled, some eight months earlier, on the Government's motion for summary judgment on its claim against Landau and its counterclaim against Unger.
 
 III. CONCLUSION
 
 69
 For the foregoing reasons, the decision of the district court granting Unger judgment as a matter of law is reversed, and the case is remanded to the district court to determine whether a new trial should be granted, and the decision of the district court granting the Government judgment as a matter of law against Landau is affirmed.
 
 
 
 *
 The Honorable William W Schwarzer, Senior Judge of the United States District Court for the Northern District of California, sitting by designation
 
 
 [1]
 The district court also certified certain questions to the Court of Appeals pursuant to 28 U.S.C. § 1292(b), but the Court of Appeals denied leave to pursue an interlocutory appeal on April 19, 1997
 
 
 [2]
 Contrast the court's articulation of the willfulness test, see Rem, 38 F.3d at 643 ("a responsible person's failure to cause the withholding taxes to be paid is not willful if he believed that the taxes were in fact being paid, so long as that belief was, in the circumstances, a reasonable one.")
 
 
 [3]
 See 11 Wright, Miller & Kane, § 2806, at 74 ("On the one hand, the trial judge does not sit to approve miscarriages of justice. The judge's power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter.") (footnotes omitted)
 
 
 [4]
 Since the only evidence Unger presented on his own behalf to establish that he did not exercise significant control in fact was his own testimony, in finding against Unger, the jury must have rejected Unger's testimony. As stated above, however, this does deprive the district judge of the power to set aside the verdict, although it will be a rare occasion on which such action is justified