**Milton RUFFIN, Plaintiff,**

v.

**Van FULLER, Defendant.**

**No. 99 Civ. 1679(DC).**

United States District Court,
S.D. New York.

Dec. 28, 2000.

---

Davis Polk & Wardwell By Jonathan Goldberg, Sudha Setty, Kimo S. Peluso, New York, New York, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York By S. Kenneth F. Jones, Maria Filipakis, Assistant Attorneys General, New York, New York, for Defendant.

## MEMORANDUM DECISION

CHIN, District Judge.

In this prisoner's civil rights case, the jury returned a verdict on September 28, 2000 finding that plaintiff Milton Ruffin had not proven that defendant Van Fuller, a New York State corrections officer, had subjected him to excessive force in violation of his constitutional rights by kicking him in the mouth. For the reasons that follow, I am ordering a new trial *sua sponte* pursuant to Fed.R.Civ.P. 59(d).

## BACKGROUND

### A. *Facts*

#### 1. *The Incident*

During October 1998, Ruffin was incarcerated in the special housing unit, or SHU, at the Sullivan Correctional Facility. (Tr. pp. 19–20).[1] On October 19, 1998, at approximately 7:42 p.m., Fuller, Sergeant Ramirez, and Corrections Officer Jordan came to Ruffin's cell to lead him to take his daily shower. Ruffin was dressed in boxer shorts, a t-shirt, and slippers. (Tr. p. 25). Consistent with SHU procedure, Fuller handcuffed Ruffin and, with the assistance of Jordan, applied a "waist chain" to Ruffin's waist before leading him to the shower. (Tr. pp. 25, 210–12).

Ruffin testified that as he was backing out of his cell, Fuller called him "a bitch," and, when he turned to respond to the comment, a struggle ensued. (Tr. p. 25). Specifically, Ruffin testified that his lower back "hit the wall"; afterward, Ruffin got down on his knees and voluntarily laid on the floor as instructed by the officers. (Tr. pp. 26, 54–55, 65). While he lay on the floor in restraints, Ruffin testified, Jordan and Ramirez held him down, and Fuller kicked him in the face approximately three or four times. (Tr. pp. 26–27, 51–

---

1. References to "Tr." are to the trial transcript.

52). Two of the kicks landed directly in Ruffin's mouth breaking his teeth and filling his mouth with blood. (Tr. pp. 27–28). Although Ruffin could not see which officer was holding his legs and which officer was holding the upper part of his body, he was certain that Fuller was the officer who kicked him. (Tr. p. 27). Another inmate, Michael Howell, also testified that he saw Fuller kick Ruffin in the mouth. (Tr. pp. 128–31, 140–41).[2]

Ruffin was treated at the prison infirmary with peroxide; approximately two or three days later he saw a dentist, who removed his shattered teeth. (Tr. pp. 36–40, 311). Despite his requests for "plates," at the time of the trial—almost two years after the incident—Ruffin's teeth still had not been repaired. (Tr. pp. 41, 61).

Fuller, Jordan, and Ramirez also testified regarding the incident. All three testified that the altercation began when Ruffin—purportedly unprovoked—turned towards the officers as he was going to the shower and kicked in the direction of Ramirez. (Tr. pp. 181, 198–99, 212–16, 280). Ramirez testified that Ruffin's kick landed on his left thigh. (Tr. p. 181, see Tr. p. 280). The officers then "took Ruffin down" to the ground at which point Ruffin "became out of control ... kicking his feet, swinging his elbows, trying to get away." (Tr. p. 181; see Tr. p. 184, 217, 281). The officers all denied that Ruffin was kicked by Fuller, or anyone else. (Tr. p. 188–91, 204, 260, 283–84). Neither Ramirez nor Fuller disputed that Ruffin's teeth were injured in the incident; they could not recall, however, how the injury happened. (Tr. pp. 201, 261, 273). Ramirez speculated that Ruffin lost his teeth at some point when he hit the floor. (Tr. p. 201). Although Fuller professed not to

know how Ruffin injured his teeth, when confronted with his deposition testimony, he admitted that in his opinion Ruffin somehow injured his teeth on his bed. (Tr. pp. 261–63). Jordan was not asked about Ruffin's injury.

### 2. *Videotape Evidence*

Sullivan surveillance video cameras recorded the incident. Although the video tapes show certain parts of the incident,[3] in some respects they are inconclusive as they do not show the entire incident. As discussed below, however, they do contradict certain aspects of the testimony of the corrections officers.

Corrections Officer James Schmidt, the custodian of the "disciplinary" surveillance videotapes at Sullivan, testified that in accordance with Sullivan practice when an incident occurs, he "secured" the tape that contained footage of the altercation and "decoded" it so that it could be viewed in a "regular" videocassette recorder. (Tr. pp. 292–94). As part of this procedure, Schmidt edited the tape using his "judgment" about what portions of the tape the correctional facility would need in the event of a disciplinary hearing regarding the incident. (Tr. pp. 292, 296, 298–300). In accordance with Sullivan policy in 1998, the original tape of the incident, containing the unedited footage, was reused after thirty days. (Tr. p. 301). Thus, whatever Schmidt unilaterally chose not to include on the "decoded" tape was forever lost. (Tr. pp. 300–01).

Ruffin presented testimony from a forensic video image analyst, Dr. Thomas Edwards. Edwards testified that the videotape of the incident was a copy that had been "highly edited" and was "missing se-

---

2. Although this testimony was consistent with that given by Ruffin, Howell's testimony was inconsistent with Ruffin's with respect to other aspects of the incident; for example, Howell testified that Ramirez did not hold Ruffin down but merely stood against the wall during the altercation. (Tr. pp. 141–42).

3. Thomas Patrick McQuade, facilities planner for the New York State Department of Corrections ("DOCS"), testified that Sullivan did not have "full coverage" in the SHU, meaning there were "blind spots." (Tr. pp. 307–09). Due to these blind spots, no camera was able to record Ruffin while he was lying on the ground in the SHU. (Tr. p. 302).

quences of images." (Tr. pp. 75, 82–83, 116). Indeed, Edwards testified that fifteen minutes of footage was missing from one camera. (Tr. p. 82, 107–08).

### 3. Medical Evidence

Ruffin presented the expert testimony of Dr. Jeffrey Burkes, an oral maxillofacial surgeon and forensic dentist. Burkes testified that Ruffin's injuries were caused by "multiple trauma to [his] two teeth, probably as a result of either punching or kicking." (Tr. p. 149). According to Burkes, the "multiple cracks" or "fractures" in Ruffin's teeth could not have occurred as a result of a single blow or impact, such as a fall on a flat floor, but rather would have resulted from "forces hitting the teeth at different angles at different times." (Tr. p. 152, 155). In addition, Ruffin's teeth were "forced upward," indicating "more than one type of force impact[ed] on his teeth." (Tr. pp. 152–53). Although Burkes admitted on cross that upward displacement of the teeth could be consistent with a fall against a radiator, on re-direct he testified that such a fall could not account for the multiple fractures seen in Ruffin's teeth. (Tr. pp. 162, 170).

Ruffin's treating dentist at Sullivan, Dr. Kevin McGraw, did not dispute Burkes's conclusions. Indeed, he confirmed that Ruffin's teeth were "pushed upward into the socket." (Tr. pp. 316–17). Fuller did not call an expert witness to contradict Burkes.

### B. Prior Proceedings

Ruffin commenced this action *pro se* on March 5, 1999, seeking damages under 42 U.S.C. § 1983 for Fuller's excessive use of force against him while he was incarcerat-

ed at Sullivan. In December 1999, the Court appointed counsel for plaintiff and subsequently permitted counsel to amend the complaint and to conduct additional discovery.

On September 28, 2000, after a four-day trial, the jury returned a verdict finding that plaintiff had not proven by a preponderance of the evidence that defendant subjected him to excessive force in violation of his constitutional rights. I did not enter judgment in the case; instead, by Order dated October 5, 2000, I advised the parties that I was considering granting a new trial *sua sponte* pursuant to Fed. R.Civ.P. 59(d). In the Order, I stated that I was concerned that the jury's verdict might be seriously erroneous or that a miscarriage of justice would occur if the verdict were permitted to stand because: (1) I was convinced that plaintiff had been kicked by one or more of the corrections officers in question; (2) I had serious questions as to the truthfulness of the testimony of the defendant and the other corrections officers in question; and (3) I was troubled that the original surveillance tapes of the incident were unavailable.[4]

To give defendant an opportunity to be heard and an opportunity, in particular, to address the concerns I raised in the October 5, 2000 Order, I ordered him to show cause, in writing, why a new trial should not be ordered. Both parties submitted briefs thereafter.

### DISCUSSION

### A. Rule 59 Standard

■ Rule 59(d) permits a district court, no later than ten days after entry of judgment, to order a new trial *sua sponte* "for

---

4. I was also concerned that I might have unduly limited plaintiff in the pretrial phase of the case by not allowing him to add new claims or parties after counsel was appointed for trial. On October 11, 2000, I received a letter from plaintiff's counsel pointing out that, in fact, by Order dated January 7, 2000, I specifically permitted plaintiff to add two defendants and to assert claims based on events occurring on the date of the original incident, but plaintiff chose not to amend his complaint. Accordingly, by Order dated October 12, 2000, I advised defendant that he did not have to address my fourth concern— that plaintiff was "unduly limited" in the pretrial phase of the case—in his response papers.

any reason that would justify granting one on a party's motion." Fed.R.Civ.P. 59(d). A new trial may be granted if: (1) "the jury has reached a seriously erroneous result," (2) "the verdict is a miscarriage of justice," and (3) the verdict is "against the weight of the evidence." *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 133 (2d Cir.1998) (quoting *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1047 (2d Cir. 1992)). Indeed, the Second Circuit has stated that "[a] district court *should* grant a new trial if it 'is convinced that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *United States v. Landau,* 155 F.3d 93, 104 (2d Cir.1998) (emphasis added) (quoting *Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 370 (2d Cir. 1988)).

▮ "[A] new trial may be granted even if there is substantial evidence supporting the jury's verdict." *DLC Mgmt.,* 163 F.3d at 134; *accord Caruolo v. John Crane, Inc.,* 226 F.3d 46, 54 (2d Cir.2000). In evaluating a motion for a new trial, "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *DLC Mgmt.,* 163 F.3d at 134. When weighing the evidence the Court will necessarily consider the credibility of the trial witnesses. *See, e.g. Landau,* 155 F.3d at 104 ("It is inherent in the proposition that the district judge may weigh the evidence that the judge will consider the credibility of witnesses."). Of course, "[a] jury's credibility assessments are entitled to deference," and the judge may not "freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Id.* at 104–05; *see also DLC Mgmt.,* 163 F.3d at 134 (jury's verdict should not be set aside unless it is "egregious") (quoting *Dunlap–McCuller v. Riese Org.,* 980 F.2d 153, 158 (2d Cir.1992), *cert. denied,* 510 U.S. 908, 114 S.Ct. 290, 126 L.Ed.2d 239 (1993)). "[P]rinciples of deference" do not, however, "override the trial judge's duty to see that there is no miscarriage of justice." *Landau,* 155 F.3d at 105 (internal quotations omitted); *see Manley v. AmBase Corp.,* 121 F.Supp.2d 758, 773 (S.D.N.Y.2000) (granting new trial).

### B. Application

▮ Here, a new trial is warranted because the jury's verdict was against the weight of the evidence presented at trial, and permitting the verdict to stand would result in a miscarriage of justice.

I am firmly convinced that Ruffin was kicked in the teeth, apparently, as he and Howell testified, by Fuller: In the circumstances of this case, kicks to Ruffin's mouth would have been an unreasonable and excessive use of force, a fact acknowledged by Jordan. (Tr. p. 284). Plaintiff's dental expert convincingly testified that plaintiff's injuries were inconsistent with a fall on a flat floor—or as defense counsel posited, a radiator—and that instead the injuries were caused by multiple blows of force to the mouth. As the expert testified, the x-rays of the two cracked teeth showed that the two teeth had been fractured in different places in different directions (both lateral and horizontal); the fractured teeth had been pushed up with a hard force (as confirmed by plaintiff's dentist); and the immediately adjacent teeth were not damaged. These facts—not contested by defendant—are wholly consistent with multiple kicks to the mouth. They are inconsistent, however, with a fall on a flat surface, such as a floor or bed.

In contrast to the medical expert's convincing testimony is the frankly incredible testimony of the officers that none of them saw how Ruffin sustained his traumatic injuries. I have serious questions as to the truthfulness of other portions of the testimony of the officers, as well. For example, all three officers testified at trial that the incident was triggered when Ruffin kicked at Ramirez. The videotape did not support the officers' contention. Indeed, Ramirez had testified at his deposi-

tion that Ruffin kicked at him with his left leg but when he was shown the videotape at trial, Ramirez conceded that this was "impossible." (Tr. p. 197–200). Likewise, Jordan testified that during the incident he did not use a night stick or baton to subdue Ruffin. (Tr. at 288). Yet, when he was shown a frame from the videotape, he acknowledged that he was in fact holding a baton. (*Id.*). Indeed, the videotape shows him apparently swinging the baton at Ruffin.

Defendant argues that the question of how plaintiff was injured "comes down to an issue of witness credibility." (Def.Mem. p. 9). This is, of course, correct; reconciling inconsistent versions of events naturally involves an assessment of credibility. Defendant further argues that the above noted inconsistencies in the officers' testimony are either not truly inconsistent (for example because Ramirez testified that he was "not a hundred percent" sure which leg Ruffin kicked with) or "immaterial." I disagree. The officers' testimony goes directly to the heart of their credibility about what took place during the altercation. Admittedly, the incident happened quickly. Nevertheless, the corrections officers' testimony strained the bounds of credulity. Examining all the evidence presented at trial, including to some extent the credibility of the witnesses, it is clear the jury's verdict was against the weight of the evidence.

Moreover, the testimony and evidence introduced at trial indicated that a critical portion of the surveillance tape made by the camera outside Ruffin's cell was destroyed. The corrections officer who maintained control of the tapes testified that he exercised his judgment to copy portions of the tapes—the portions he felt

the administrative hearing officer would need—and then permitted the original tapes to be recycled. As a consequence, the original tape recordings were erased. The portion of the tape showing the corrections officers returning Ruffin to his cell immediately *after* the incident was erased. This was obviously a crucial segment; if nothing indeed happened, as defendant would suggest, then certainly the institution would have wanted to retain that portion of the tape, to show that, indeed, nothing had happened.

Defendant argues that by expressing this concern the Court is "conflating" the interests of "the institution," DOCS, with that of the defendant, Fuller, and that the Court is succumbing to "popular prejudice" against penal institutions. (Def.Mem. p. 17). The notion that I have a prejudice against correctional facilities is needless to say incorrect; indeed it is offensive.

Defendant further argues that because I gave an adverse inference instruction with respect to the missing videotape, I should assume the jury "weighed the significance of the missing portions of the tape" and reasonably arrived at its verdict. I do not know if the jury considered this evidence. Whether or not it did, however, it is clear that the verdict it rendered was seriously erroneous in light of all the evidence presented at trial.

For the foregoing reasons, I am convinced that no reasonable jury having examined the testimony and evidence could have concluded that plaintiff's constitutional rights were not violated. The jury's verdict was seriously erroneous and, if permitted to stand, would result in a miscarriage of justice; accordingly, I am ordering a new trial.[5]

---

5. Plaintiff argues that a new trial is also warranted due to defense counsel's misconduct. In particular, plaintiff argues that defense counsel (1) "consistently and improperly attempted to bring forth information specifically precluded" by the Court's rulings on the motions *in limine,* and (2) alluded to plaintiff's "prior bad acts" in an attempt to prejudice the jury. It is true that "a party is entitled to a new trial when opposing counsel's conduct causes prejudice to that party by appealing to a jury's possible biases, thereby unfairly influencing its verdict." *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 51 (2d Cir.1998). I do not reach this issue, in view of the ruling above. I do note that defense

Plaintiff's request to "be given the opportunity to move for additional discovery and to amend the complaint" is denied. (Pl. Mem. p. 1 n. 1). In January 2000, nine months prior to trial, I specifically permitted plaintiff to add both additional defendants and additional claims based on events occurring on the date of the original incident. At that time, plaintiff's counsel made the tactical decision not to amend the complaint; allowing amendment now would cause undue prejudice to Fuller.

## CONCLUSION

For the foregoing reasons, I am ordering a new trial *sua sponte* pursuant to Fed.R.Civ.P. 59(d). The parties are directed to appear for pretrial conference on January 26, 2001, at 10:30 a.m. in Courtroom 11A of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007.

SO ORDERED.

counsel seemingly ignored my rulings on numerous occasions, inquiring into matters that I had previously ruled were off-limits because the danger of unfair prejudice outweighed their probative value.