**John and Joyce SILIVANCH, Plaintiffs,**

v.

**CELEBRITY CRUISES, INC., Fantasia Cruising Inc., Essef Corp., PAC–FAB, Inc., and Structural Europe, N.V. (f/n/a SFC), Defendants.**

**Celebrity Cruises, Inc. and Fantasia Cruising Inc., Third–Party Plaintiffs,**

v.

**Structural Europe, Essef Corp., and PAC–FAB, Inc., Third–Party Defendants.**

**Nos. 95 Civ. 0374BSJJCF, 94 Civ. 5270BSJJCF.**

United States District Court, S.D. New York.

Sept. 28, 2001.

Steven M. Hayes, Robert A. Jacobs, Parcher, Hayes & Snyder, PC, New York City, for plaintiffs.

Gregory O'Neill, James Hazen, Hill, Betts & Nash LLP, Newark, NJ, for defendants.

Robin G. Weaver, Squire, Sanders & Dempsey, Cleveland, OH, for third-party defendants.

## MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

In July 1994, there was an outbreak of Legionnaires' Disease, a form of pneumonia, among passengers who had disembarked from the cruise ship Horizon after a voyage to Bermuda. An investigation by the United States Centers for Disease Control and Prevention revealed the presence of Legionella bacteria in the filters of the ship's whirlpool spa. Many of the victims (collectively, the "Passenger Plaintiffs") brought suit against Celebrity Cruises Inc. and Fantasia Cruising Inc. (collectively, "Celebrity"), the owners and operators of the Horizon. They also sued Essef Corporation, Pac–Fab, Inc., and Structural Europe, N.V. (collectively, the "Essef Defendants"), affiliated companies that had designed, manufactured, and distributed the filters. In addition, Celebrity filed a complaint and cross-claims against the Essef Defendants seeking indemnification and contribution and also seeking damages for products liability, breach of warranty, fraud, and negligent misrepresentation.

The cases were consolidated for discovery, and the parties consented to refer each action to me for all purposes including trial pursuant to 28 U.S.C. § 636(c). The parties also stipulated that the Silivanch action would be tried as a bellwether case and would result in a determination of the liability of Celebrity and the Essef Defendants to the Passenger Plaintiffs, an allocation of responsibility among the defendants, a determination of the Essef Defendants' liability on Celebrity's claims, and an assessment of any punitive damages. The parties also agreed that the jury in the bellwether case would award compensatory damages to the Silivanch plaintiffs, but that separate compensatory damage trials would be held with respect to the remaining plaintiffs and with respect to Celebrity's claims against the Essef Defendants.

After receiving evidence over a period of six weeks in the Silivanch case, the jury rendered its verdict. It found Celebrity liable to the Passenger Plaintiffs for negligence and the Essef Defendants liable to these plaintiffs for negligence and strict products liability, as well as breach of express and implied warranties. Further, the jury held the Essef Defendants liable to Celebrity for fraud, negligence, strict products liability, breach of express and implied warranties, and negligent misrepresentation. The jury allocated thirty percent of the responsibility for the Passenger Plaintiffs' injuries to Celebrity and seventy percent to the Essef Defendants. It also held the Essef Defendants liable both to the Passenger Plaintiffs and to Celebrity for punitive damages.

Thereafter, the jury calculated the amount of damages to be awarded. It

found the Essef Defendants liable for $7 million in punitive damages, of which it awarded sixty percent to the Passenger Plaintiffs and forty percent to Celebrity. The jury then awarded John Silivanch $110,000 for medical expenses, $1,350,000 for lost earnings, and $900,000 for pain and suffering, and it awarded $300,000 to his wife Joyce for loss of society. Following the jury determination, I granted the plaintiffs' application for an award of prejudgment interest.

The defendants now move pursuant to Rules 50(b) and 59(a) of the Federal Rules of Civil Procedure for judgment as a matter of law or for a new trial. The Essef Defendants seek judgment or a new trial with respect to all claims of strict liability and negligence, and in particular with respect to proof of causation.[1] They also move for judgment as a matter of law striking the awards for punitive damages and loss of society, and they seek a new trial on compensatory damages as well as judgment as to certain elements of that award. In addition, these defendants request a new trial based on purported errors in the admission of evidence, the jury instructions, and the conduct of the proceedings. They also renew their motion for judgment as a matter of law or seek a new trial with respect to Celebrity's claims of fraud. Finally, Essef Corporation and Pac–Fab, Inc. seek judgment or a new trial, arguing that there is no evidence of direct liability as to them and no basis for finding them vicariously liable for the acts of Structural Europe, N.V.[2]

Celebrity, in turn, has filed posttrial motions on two narrower points. It seeks

judgment as a matter of law striking the award for loss of society and it challenges the award of prejudgment interest.

With respect to all of the defendants' applications, the relevant facts will be discussed in the context of each legal argument.

*Discussion*

### A. *Legal Standards*

Judgment as a matter of law may be granted under Rule 50 only if "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Galdieri–Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276, 289 (2d Cir.1998) (citations omitted) (alterations in original). The court must view the evidence in the light most favorable to the party opposing the motion and must defer to all of the jury's credibility determinations and reasonable inferences. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Raniola v. Bratton*, 243 F.3d 610, 616 (2d Cir.2001); *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir.2000); *Galdieri–Ambrosini*, 136 F.3d at 289. On a Rule 50 motion, the court "may not weigh the credibility of witnesses or otherwise consider the weight of the evidence." *Caruolo*, 226 F.3d at 51 (citing *Galdieri–Ambrosini*, 136 F.3d at 289). Indeed, "although the court should review the record

---

1. · Curiously, the Essef Defendants have also moved for judgment on the plaintiffs' failure to warn claim, and the plaintiffs have responded. However, the jury returned a verdict in favor of the Essef Defendants on this claim.

2. Notwithstanding the fact that the Essef Defendants filed seven separate motions, their arguments frequently overlap. Therefore, in discussing any single issue, I may be drawing on contentions contained in more than one Essef brief.

as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151, 120 S.Ct. 2097 (citation omitted).

■ The standard for granting a new trial under Rule 59 is less stringent. "[U]nlike a motion for judgment as a matter of law, a trial judge considering a motion for a new trial is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner." *United States v. Landau*, 155 F.3d 93, 104 (2d Cir.1998) (internal quotations and citation omitted). Accordingly, " 'a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict.' " *Caruolo*, 226 F.3d at 54 (quoting *Landau*, 155 F.3d at 104). A new trial is warranted if the court "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Caruolo*, 226 F.3d at 54 (internal quotations and citation omitted).

Each of the defendants' motions may now be judged against these standards.

## B. *Negligence*

■ I previously determined that this litigation falls within the admiralty jurisdiction of the court. *In re Horizon Cruises Litigation*, 101 F.Supp.2d 204, 207–09 (S.D.N.Y.2000). "With admiralty jurisdiction comes the application of substantive admiralty law." *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). And, in admiralty law, common law principles of negligence apply. *See Smith v. Mitlof*, 130 F.Supp.2d 578, 582 (S.D.N.Y.2001); *Jurgens v. Poling Transportation Corp.*, 113 F.Supp.2d 388, 396–97 (E.D.N.Y.2000); *Diesel Tanker Ira*

*S. Bushey, Inc. v. Tug Bruce A. McAllister*, No. 92 Civ. 5559, 1994 WL 320328, at *6 (S.D.N.Y. June 29, 1994); *see also East River Steamship*, 476 U.S. at 863–66, 106 S.Ct. 2295 (incorporating principles of product liability into maritime law).

■ The elements of negligence are: (1) a duty owed by the defendant to the plaintiff; (2) breach of that duty; (3) proximate causation of the plaintiff's injuries; and (4) damages. *See Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 79 (2d Cir.1997); *see also Alfaro v. Wal–Mart Stores, Inc.* 210 F.3d 111, 114 (2d Cir.2000) (conflating the elements of causation and damages). This formula is routinely applied in maritime cases. *See Petitt v. Celebrity Cruises, Inc.*, 153 F.Supp.2d 240, 252–53 (S.D.N.Y.2001); *Jurgens*, 113 F.Supp.2d at 397; *In re Queen of Hearts Cruises, Inc.*, Nos. 96 Civ. 6712, 98 Civ. 0111, 1999 WL 195298, at *6 (S.D.N.Y. April 7, 1999). The evidence at trial amply supported the jury's finding of negligence against the Essef Defendants.

### 1. *Facts Relevant to Negligence*

The Essef Defendants designed and manufactured the model TR–140 high rate sand filter used aboard the Horizon. The main body of the filter is a hollow cylinder. Water from the whirlpool spa is introduced into the filter by a diffuser that operates like a shower head and disperses the water when the filter is operating in filtration mode. The water then seeps through the filter medium, consisting of silica sand, which captures particulate matter such as hair, dirt, and oils. Below the sand is a gravel bed that contains a hub from which laterals radiate like the spokes of a wheel. While the filter is in filtration mode, the water passes through holes in the laterals and returns to the whirlpool spa. (Tr.

1344–46).[3]

Periodically, the filter must be backwashed to remove particulate matter that has built up during the filtration phase. Essentially, the flow is reversed. Clean water is forced through the laterals and up through the sand, dislodging the dirt and debris that has accumulated. It is forced out of the filter and is ultimately released overboard. (Tr. 1346–47).

There is substantial evidence in the record that the TR–140 filter did not backwash properly. Because the laterals did not extend all the way to the walls of the cylinder, the filter was subject to "coring," also known as "channeling." This means that during backwash the water flowed up primarily through the center of the sand, leaving the outer edges of the medium uncleansed. (Tr. 1355–58). Moreover, testing demonstrated that the sand did not completely fluidize during backwashing. In order for the filter medium to be properly cleaned, it is necessary for the entire sand bed to be lifted so that the water can circulate around each silica grain. (Tr. 1346–47). The TR–140 did not accomplish this.

Because of the small size of Legionella bacteria, it is highly unlikely that individual microbes would be trapped by a sand filter, since they would pass through the interstices between the grains of silica. However, according to the evidence in this case, organic matter in the form of biofilms developed in the filters. These biofilms provided a medium for Legionella bacteria to proliferate and also protected them from halogens such as chlorine and bromine which are added to the spa water as disinfectants. (Tr. 1173–75, 1684–85, 1704–06, 1755, 2306). As the water containing the bacteria was released into the whirlpool, it became aerosolized and was inhaled by bathers, causing Legionnaires' Disease among those most susceptible. (Tr. 1164–65; Pl. Exh. 36 at 5, 7).

### 2. Existence of a Duty

The Essef Defendants maintain that they owed no duty to the plaintiffs both because the filter was not designed to interdict Legionella or other bacteria and because no one could have foreseen that a sand filter would be a source of Legionnaires' Disease. Neither argument is persuasive.

First, a manufacturer owes a duty to consumers broader than merely the duty to produce products that will achieve their intended purpose; it is obligated to market only those products that are reasonably safe when used for the intended purpose. *See Cacciola v. Selco Balers, Inc.*, 127 F.Supp.2d 175, 185 (E.D.N.Y. 2001); *Hamilton v. Accu–Tek*, 62 F.Supp.2d 802, 822 (E.D.N.Y.1999); *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237, 677 N.Y.S.2d 764, 766, 700 N.E.2d 303 (1998). Thus, for example, an automobile manufacturer may be liable for producing a car with a gas tank which, although it adequately supplies the engine with fuel, is susceptible to explosion in the event of a rear-end collision. More to the point, the manufacturer of a device that creates conditions conducive to the proliferation of bacteria may be liable to persons who become ill as a result, even if the device otherwise performs as required. For example, the maker of functionally effective tampons has a duty to design them to minimize the incidence of toxic shock syndrome, *see, e.g., Graham v. Playtex Products, Inc.*, 993 F.Supp. 127, 128–29, 134 (W.D.N.Y.1998), and the manufacturer of an intra-uterine device must minimize the danger of pelvic inflammatory disease re-

---

**3.** "Tr." refers to the trial transcript.

gardless of how well the product works as a contraceptive. *See, e.g., Worsham v. A.H. Robins Co.,* 734 F.2d 676, 681–82 (11th Cir.1984). In this case, the Essef Defendants had a duty not to distribute a filter that facilitated the growth of harmful bacteria.

■ Second, the Essef Defendants construe the foreseeability requirement too narrowly. A manufacturer may be liable for marketing a product that causes injuries that were generally foreseeable; a plaintiff need not demonstrate that the defendant should have foreseen the precise type of injury that actually occurred. The Restatement (Second) of Torts states:

(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

(2) the actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.

Restatement (Second) of Torts § 435. Thus, if a defendant's conduct could predictably contribute to the transmission of disease, that defendant is liable even if the particular disease contracted by a plaintiff is rare. For example, because it is well-known that mishandling of blood supplies may result in the infection of persons who receive transfusions, blood services may be liable to a victim who contracted Acquired Immune Deficiency Syndrome ("AIDS"), even if the defendant's conduct occurred before AIDS was identified. *See Wadleigh v. Rhone–Poulenc Rorer, Inc.,* 157 F.R.D.

410, 420 (N.D.Ill.1994); *Doe. v. United States,* 737 F.Supp. 155, 162 (D.R.I.1990); *Gaffney v. United States,* No. 88–1457–Z, 1990 WL 57625, at *7 (D. Mass. April 26, 1990).

In this case, the jury heard evidence that by the 1980's the spa industry, including officials of the Essef Defendants, had become aware that certain illnesses, including Legionnaires' Disease, were associated with the operation of whirlpool spa systems. (Tr. 1664–67, 1669–71, 1680–81, 1757; Deposition of Stanley H. Frederick dated May 17, 1999 ("Frederick May 17, 1999 Dep."), at 129, 161–66, attached as Exh. 2 to Declaration of Robert A. Jacobs dated Feb. 16, 2001 ("Jacobs Decl."); Deposition of Stanley H. Frederick dated May 18, 1999 ("Frederick May 18, 1999 Dep."), at 278–80, 382–83, attached as Exh. 3 to Jacobs Decl.; Deposition of Ronald Robol dated May 20, 1999 ("Robol May 20, 1999 Dep."), at 1116–17, attached as Exh. 5 to Jacobs Decl.; Exhs. C–116, C–324, attached as Exhs. 7 and 8, respectively, to Jacobs Decl.).[4] Significantly, it was known that the build-up of organic materials reduced the effectiveness of chemical disinfectants. (Tr. 1683–84, 1704–06). Accordingly, in 1984, the National Sanitation Foundation ("NSF") modified its standards for sand filters to require them to demonstrate that backwashing would thoroughly remove organics. (Tr. 1703–06). Thus, there is evidence that the connection between the operation of sand filters and the transmission of disease was sufficiently well-known to satisfy the foreseeability requirement.

### 3. *Breach of the Duty*

The Essef Defendants' argument that they breached no duty conflates with their contention that they had no duty to begin

---

**4.** All referenced deposition testimony was presented to the jury by videotape.

with. They maintain that since they were not required to produce a filter that screened out pathogens, they did not breach any legal obligation. But, as discussed above, the duty was to produce a filter that did not create an environment conducive to the proliferation of bacteria, and there was sufficient evidence that the Essef Defendants breached this duty.

The TR–140 filter had been designed for use in swimming pools. (Tr. 342–44). Nevertheless, the Essef Defendants marketed it for use in spas as well, and included a sticker that falsely stated that the National Sanitation Foundation had approved it for such purposes. (Frederick May 17, 1999 Dep. at 170–71; Pl. Exh. 54 ¶¶ 33, 34). Prior to doing so, they never conducted tests to determine whether it was suited for use in spas. (Tr. 239, 403; Frederick May 17, 1999 Dep. at 191; Pl. Exh. 54 ¶¶ 11–14). Indeed, the TR–140 failed the NSF's sand bed flatness test (Tr. 615–16), a result that indicated that the filter might have problems with coring or channeling. (Tr. 341, 641). One of Essef Corporation's own employees, Steven Suchanek, had warned the president of that company that the TR–140 was defectively designed and that its inability to backwash properly was preventing disinfectants from circulating throughout the filter medium. (Tr. 1344, 1355–62, 1373–79). Similarly, Stanley Frederick, Pac–Fab's former vice president for engineering, testified that the TR–140 was not well suited for spas because it could not be completely cleansed of accumulated organic materials. (Frederick May 17, 1999 Dep. at 88–89, 184–85; Exh. C–152). Indeed, Pac–Fab's chief engineer stated that he would not recommend using the filter in spas. (Robol May 20, 1999 Dep. at 1133–34). Nevertheless, the TR–140 continued to be marketed for just such purposes.

### 4. *Proximate Cause*

There is no dispute that John Silivanch, along with other passengers, acquired Legionnaires' Disease from the whirlpool spa aboard the Horizon. The Essef Defendants do, however, contest two aspects of causation. First, they argue that the most severe of Mr. Silivanch's injuries are not attributable to the disease. This issue will be considered below in connection with the analysis of compensatory damages. Second, these defendants contend that there was insufficient proof that the TR–140 filters contributed to the presence of Legionella bacteria in the spa. That argument is not persuasive.

In the investigation of the outbreak aboard the Horizon, the Centers for Disease Control and Prevention (the "CDC") recovered Legionella bacteria from the sand filters of the spa system. (Pl. Exh. 37 at 6, 11). These bacteria were indistinguishable from organisms found in the respiratory system of one of the victims of the outbreak. (Pl. Exh. 37 at 6). Furthermore, the CDC found that "[v]isual examination of the filter material showed extremely heavy organic loading. This loading remained in the filter despite reports that a routine (daily) filter backwash cycle was implemented." (Pl. Exh. 37 at 11). These objective observations provided the basis for the inferences drawn by the plaintiffs' expert witnesses. Linden Witherell, an expert in public health engineering and epidemiology, testified that the failure of the TR–140 filter to backwash properly had allowed the accumulation of organic matter in the filters, which in turn trapped Legionella bacteria and provided an environment for them to proliferate. (Tr. 1690–93, 1705–09, 1753–56, 1783–85, 2274–76, 2306–08, 2317–20). Similarly, Dr. Joseph Plouffe, an epidemiologist, also identified the filters as the point of amplification for Legionella within the

spa system on the Horizon. (Tr. 1174–75, 1177, 1196, 1203–04). The jury thus had sufficient evidence from which it could find causation. None of the Essef Defendants' efforts to undermine that evidence warrant either judgment as a matter of law or a new trial.

### a. *Halogenation*

■ The Essef Defendants maintain that the outbreak was attributable not to the filters but to the failure of the crew to utilize chemical disinfectants properly. The Essef Defendants' expert, Dr. William Rowley, testified that with adequate halogenation, no Legionella should have been able to survive and infect the passengers. (Tr. 2196). The plaintiffs' experts, however, had testified as to the mechanisms by which the build-up of organic material in the filters would protect the bacteria and render the halogens less effective. The jury was entitled to credit this evidence.

■ To the extent that the Essef Defendants now argue that Celebrity's negligence was a superceding cause that relieves them of liability, this contention, too, must be rejected. The party seeking to establish a superceding cause has the burden of demonstrating that the act in question was the sole proximate cause of the injuries incurred. *See Exxon Co. v. Sofec, Inc.,* 54 F.3d 570, 574–75 (9th Cir. 1995), *aff'd,* 517 U.S. 830, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996). And, whether a party has met that burden is generally an issue for the jury. *See Parsons v. Honeywell, Inc.,* 929 F.2d 901, 905 (2d Cir.1991). Here, it was rational for the jury to determine that Celebrity's negligence was a concurrent, not superceding, cause of the outbreak. *See Hirsch v. Polymark Corp.,* 889 F.Supp. 714, 715–16 (S.D.N.Y.1995)

(employee's removal of safety guard concurrent cause of plaintiff's injury along with defective design of machine). The jury could reasonably have concluded that the accumulation of organics in a negligently designed TR–140 filter was the principal cause of the outbreak and, at the same time, determine that Celebrity was also negligent for failing to take precautions against filter failure such as periodically superchlorinating the spa system.[5]

■ With respect to the issue of Celebrity's negligence, the Essef Defendants also complain that their expert, Dr. Rowley, was precluded from testifying that the spa was operated with one pump at a time rather than two. (Tr. 2104–08). This witness did, however, offer his opinion that operation in this manner was "unbelievable." (Tr. 2104). He was prevented only from offering calculations of flow based on a single pump because these calculations had not been disclosed during expert discovery prior to trial. (Tr. 2107). This preclusion order was appropriate under Rule 37(c)(1) of the Federal Rules of Civil Procedure since this failure to disclose would have prejudiced the plaintiffs and Celebrity by preventing them from effectively challenging at trial the somewhat arcane analysis. *See Lamarca v. United States,* 31 F.Supp.2d 110, 122 (E.D.N.Y. 1999). Moreover, Dr. Rowley's failure to include these calculations in his expert report cannot be excused on the basis that the factual predicate for them was only revealed at trial: the fact that the spa was operated with a single pump was disclosed in a deposition in 1997 (Deposition of Ioannis Ladakis dated March 3, 1997, at 89, attached as Exh. 19 to Jacobs Decl.), as well as in the spa system operations manu-

---

**5.** Superchlorination is a "shock treatment" in which high doses of chlorine are temporarily introduced into the system to eradicate bacteria that may have survived routine disinfection. (Tr. 987–90).

al produced in pretrial discovery. (Pl. Exh. 19 attached as Exh. 20 to Jacob Decl.).

### b. Post Hoc, Ergo Propter Hoc

■ The Essef Defendants next argue that the mere fact that the passengers became ill after the spa water had passed through the TR–140 filters does not prove that the filters caused the disease. This proposition is unassailable. "[A] temporal relationship by itself provides no evidence of causation." *In re Breast Implant Litigation*, 11 F.Supp.2d 1217, 1238 (D.Colo. 1998) (citation omitted). But such a temporal relationship can corroborate other proof of a causal nexus, *see Zuchowicz v. United States*, 140 F.3d 381, 385 (2d Cir. 1998), and, as discussed above, there is much evidence here beyond the mere fact that the spa water passed through the filters at a point in time before the passengers were infected.

### c. The Zenith

Next, the Essef Defendants reason that any inference of causation is negated by the fact that there was never an outbreak of Legionnaires' Disease on the Zenith, a sister ship to the Horizon that was also operated by Celebrity and which had an identical spa system including TR–140 filters. There is no merit to this rationale. In the real world causation is rarely so uncomplicated that seemingly similar conditions will always lead to the same outcome. While it could certainly be argued to the jury that the experience of the Zenith indicated that the filters were not at fault for the outbreak on the Horizon, the jury was not obligated to credit that argument.

### d. Post–Sale Alterations

■ The Essef Defendants also contend that the TR–140 filters were substantially altered after sale in that the laterals were deformed, apparently by heat, and thus rendered less effective. "[I]f a consumer alters a product in a way that creates a defect, the consumer's conduct rather than the manufacturer's is the proximate cause of any ensuing accident." *Hood v. Ryobi America Corp.*, 181 F.3d 608, 612 (4th Cir.1999) (citation omitted). Put another way,

> [t]he injuries suffered by [the plaintiff] must be the proximate result of a defect which existed in the product at the time it was sold, and if the product has been materially altered or modified by a third party after the sale, those injuries cannot be traced to be the proximate result of [the defendant's] original design.

*Lamb v. Sears, Roebuck & Co.*, 1 F.3d 1184, 1188 (11th Cir.1993) (citations omitted). *See also Valentin v. C.G. Bretting Manufacturing Co.*, 278 A.D.2d 230, 231, 717 N.Y.S.2d 281, 282 (2d Dep't 2000) (issue of fact regarding material modification precludes summary judgment); *Rios v. Rockwell International Corp.*, 268 A.D.2d 279, 280, 701 N.Y.S.2d 386, 386–87 (1st Dep't 2000) (same).

■ To immunize a manufacturer from liability, then, any alteration must have been material. In this case, the jury heard conflicting evidence on this issue. While the Essef Defendants' expert testified that the post-sale changes in the filters were significant (Tr.2099–2103), there was also substantial evidence, based on testing of unaltered models, that the filter never backwashed properly. It was therefore within the province of the jury to determine that whatever changes occurred were immaterial to the functioning of the filters and to the manufacturer's liability.

### C. Strict Liability: Design Defect

■ In addition to finding the Essef Defendants negligent, the jury concluded

that they were strictly liable for injuries caused by the TR–140 filters. Admiralty law incorporates principles of strict products liability. *East River Steamship*, 476 U.S. at 865, 106 S.Ct. 2295. Those principles are summarized in the Restatement (Second) of Torts:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
> (a) the seller is engaged in the business of selling such a product, and
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A(1). *See also In re M/V Danielle Bouchard,* 164 F.Supp.2d 794, 797–98 (E.D.La.2001); *Cigna Property & Casualty Insurance Co. v. Bayliner Marine Corp.,* No. 92 Civ. 7891, 1995 WL 125386, at *11–*12 (S.D.N.Y. March 22, 1995); *In re American Export Lines, Inc.,* 620 F.Supp. 490, 517 (S.D.N.Y.1985). The Essef Defendants argue that, in two respects, the evidence of defect was insufficient.[6] First, they maintain that the testimony of the experts proffered by the plaintiffs and by Celebrity was not scientifically sound and should have been excluded. That argument will be addressed below in connection with the Essef Defendants' motion for a new trial. Second, they contend that there was no adequate evidence of a viable alternative to the TR–140 filter.

■■■■■■ Although there is substantial overlap between negligence and strict liability, "[s]trict products liability ... differs from a cause of action for a negligently

designed product in that the plaintiff is not required to prove that the manufacturer acted unreasonably in designing the product. The focus shifts from the conduct of the manufacturer to whether the product, as designed, was not reasonably safe." *Voss v. Black & Decker Manufacturing Co.,* 59 N.Y.2d 102, 107, 463 N.Y.S.2d 398, 401, 450 N.E.2d 204 (1983). Accordingly,

> A product is unreasonably dangerous if a reasonable person would conclude that the product's utility did not outweigh the risk inherent in marketing a product designed in that manner. The decision whether a product is unreasonably dangerous is one for the jury, which it may determine after taking into account alternative designs, their costs, and the product's usefulness.

*Urena v. Biro Manufacturing Co.,* 114 F.3d 359, 364 (2d Cir.1997) (citing *Voss,* 59 N.Y.2d at 107, 463 N.Y.S.2d at 402, 450 N.E.2d 204).

■■■■ As discussed in the analysis of the negligence claim, there was ample evidence presented that the design of the TR–140 filter created a danger of infectious disease. There was also evidence that at least three alternative designs existed. The first was created by Steven Suchanek, an employee of Essef Corporation. Known as the "Pentazone" design, this hub and lateral configuration was patented by Mr. Suchanek and was actually marketed by the Essef Defendants. (Tr. 2014–15, 1362–69). The Essef Defendants contend that they discontinued sale of the Pentazone because the design was not robust: that is, it required extreme precision in the component parts and their assembly. (Tr.2016–17). However, there was also evidence that the problems related

---

6. The Essef Defendants' additional argument that the filters were substantially altered after

sale has already been addressed above.

simply to a supply of inferior plastic (Tr. 1382–83), and the jury was entitled to conclude that the Pentazone design was viable. Moreover, the Essef Defendants also marketed a TR–140C filter that achieved better results by using four diffuser heads rather than one. (Tr. 242–44). Finally, they located still a third design in Europe. (Tr. 1311, 2020, 2027, 2031). Thus, there is sufficient evidence that commercially acceptable design alternatives were available.

### D. *Breach of Warranties*

#### 1. *Implied Warranty*

 The Essef Defendants next argue that they may not be held liable for breach of implied warranty because that cause of action is duplicative of the plaintiffs' design defect claim. However, "in a products liability case a cause of action for strict liability is not identical to a claim for breach of warranty." *Castro v. QVC Network, Inc.*, 139 F.3d 114, 117 (2d Cir.1998) (citing *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 251, 639 N.Y.S.2d 250, 251, 662 N.E.2d 730 (1995)). First, "the core element 'defect' is subtly different in the two causes of action." *Denny*, 87 N.Y.2d at 256, 639 N.Y.S.2d at 255, 662 N.E.2d 730.

> While the strict products concept of a product that is "not reasonably safe" requires a weighing of the product's dangers against its over-all advantages, the ... concept of a "defective" product [for warranty purposes] requires an inquiry only into whether the product in question was "fit for the ordinary purposes for which such goods are used."

*Id.* at 258, 639 N.Y.S.2d at 256, 662 N.E.2d 730 (citation and footnote omitted). Second, as a result of this conceptual distinction, the elements that must be proven for each cause of action differ. In order to establish a breach of implied warranty, the plaintiff must show: "(1) that the product

was defectively designed or manufactured; (2) that the defect existed when the manufacturer delivered it to the purchaser or user; [and] (3) that the defect is the proximate cause of the accident." *Cigna*, 1995 WL 125386, at *12 (quoting *American Export Lines*, 620 F.Supp. at 518). Thus, on an implied warranty claim, the injured party need not demonstrate that safer designs were available. *See Groome v. Matsushita Electric Corp.*, No. 92 CV 3073, 2000 WL 341134, at *6 (E.D.N.Y. March 30, 2000); *Denny*, 87 N.Y.2d at 259, 639 N.Y.S.2d at 256, 662 N.E.2d 730. The jury's verdicts on design defect and implied warranty are therefore not redundant.

#### 2. *Express Warranty*

 The Essef Defendants' argument with respect to the Passenger Plaintiffs' claims of breach of express warranty is more persuasive. They contend that this cause of action must fail because no express warranties were ever made directly to the plaintiffs. Rather, the warranty at issue—the representation that the TR–140 filter was certified by the National Sanitation Foundation for use in spas—was contained in a sticker on the filters themselves that would never be seen by a passenger on the vessel.

 The plaintiffs respond that an express warranty extends not only to the direct purchaser of the product but also to all persons who might reasonably be expected to use it or be affected by it. In some jurisdictions, it appears that the law of products liability has indeed evolved that far. *See Sullivan v. Young Brothers & Co.*, 91 F.3d 242, 249–50 (1st Cir.1996) (applying Maine law). In others, however, it is still the law that the injured party must be in privity with the defendant in order to maintain an express warranty claim. *See Marshall v. Wellcraft Marine, Inc.*, 103 F.Supp.2d 1099, 1113–14

(S.D.Ind.2000) (construing Florida law). In New York, the courts appear to have taken a middle ground. While there need be no contractual privity between the manufacturer and the consumer, the representations at issue must have been publicly disseminated and relied on by the injured party. *See Oak Point Associates v. Southern States Screening, Inc.*, No. 89 Civ. 7362, 1992 WL 197419, at *3 (S.D.N.Y. Aug. 4, 1992); *Randy Knitwear, Inc. v. American Cyanamid Co.*, 11 N.Y.2d 5, 10–13, 226 N.Y.S.2d 363, 365–68, 181 N.E.2d 399 (1962); *County of Chenango Industrial Development Agency v. Lockwood Greene Engineers, Inc.*, 114 A.D.2d 728, 730, 494 N.Y.S.2d 832, 834 (3d Dep't 1985). I do not believe that the general common law as is applicable in this admiralty case has developed beyond the stage reflected in the law of New York. Since there is no evidence that the Essef Defendants displayed their warranty to the general public or that the plaintiffs relied on or were even aware of it, the express warranty claim must be dismissed.

## E. *Essef Defendants' Individual Liability*

The Essef Defendants next argue that there was insufficient evidence to find Pac–Fab and Essef Corporation—as opposed to Structural Europe—individually liable.[7] They contend that the high standards for piercing the corporate veil were not met in this case.

This argument fails for two reasons. First, the plaintiffs have never advanced a claim based on vicarious liability. Rather, they contend that each of the Essef Defendants played a direct role in the design, manufacture, and distribution of the TR–140 filter such that they may all be held jointly and severally liable.

**More** importantly, the Essef Defendants have forfeited the opportunity to assert that Pac–Fab and Essef Corporation may not be held individually liable by failing to raise this claim in their motion for judgment as a matter of law ("JMOL") at the close of the plaintiffs' case. It is well established that:

> when a preverdict motion for JMOL has been made, the movant may not add new grounds after trial. The posttrial motion is limited to those grounds that were "specifically raised in the prior motion for [JMOL]." In sum, a posttrial motion for JMOL can properly be made only if, and to the extent that, such a motion specifying the same grounds was made prior to the submission of the case to the jury.

*McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir.1997) (quoting *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir. 1993)) (other citations omitted); *see also Tolbert v. Queens College*, 242 F.3d 58, 76–77 (2d Cir.2001); *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 129 (2d Cir. 1999); *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 164 (2d Cir.1998); *Galdieri–Ambrosini*, 136 F.3d at 286; *Cruz v. Local Union No. 3 of the International Brotherhood of Electrical Workers*, 34 F.3d 1148, 1155 (2d Cir.1994).

> [T]he purpose of requiring the moving party to articulate the ground on which JMOL is sought is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury. The articulation is necessary so that the responding party may seek to correct any overlooked deficiencies in the proof. Accordingly, the JMOL motion must at least identify the specific element that

---

**7.** Pac–Fab and Structural Europe are subsidiaries of Essef Corporation. (Tr. 194–95).

the defendant contends is insufficiently supported.

*Galdieri–Ambrosini,* 136 F.3d at 286 (citations and internal quotations omitted). Thus, "[a] motion that identifies one element of a claim is insufficient to permit the district court to grant JMOL for lack of proof of some other, unspecified, element." *Tolbert,* 242 F.3d at 77 (citations omitted).[8]

In their pre-verdict motion in this case, the Essef Defendants devoted each of their arguments to issues common to all of them. In no instance did counsel suggest that evidence was wanting as to Pac–Fab or Essef Corporation in particular. (Tr. 1824–58). The only time these defendants were even separately identified during argument on the motion was when counsel for the Essef Defendants contended that none of them had guaranteed the safety of the filter:

> It's very clear that no one at Essef or Pac–Fab or Structural Europe ever represented that this sand filter had any role to play whatsoever in the prevention of disease.

(Tr. 1825). This hardly constitutes articulation of a claim that any specific element of negligence or strict liability was uniquely lacking with respect to a particular defendant.

■ A party that fails to advance a ground for judgment as a matter of law prior to verdict forfeits that argument on

any renewed motion unless the consequence would be "manifest injustice." *See, e.g., Tolbert,* 242 F.3d at 77; *Pahuta,* 170 F.3d at 129; *Galdieri–Ambrosini,* 136 F.3d at 287; *Cruz,* 34 F.3d at 1155. For example, noncompliance with Rule 50(a) may be overlooked "where a jury's verdict is wholly without legal support." *Pahuta,* 170 F.3d at 129 (citations and quotations omitted). In the case of defendants held jointly liable, then, the failure to move for JMOL on behalf of one of them individually might be ignored if that defendant played no part in the tortious conduct.

■ That is not the case here. For example, the TR–140 filter was designed by Edward LeBreton while he was an engineer working at Pac–Fab but on the payroll of Structural Fibers, Inc., now known as Essef Corporation. (Tr. 312, 314, 323). Structural Europe relied on Pac–Fab for testing of the TR–140 filter and for information concerning complaints that Structural Europe received about it. (Tr. 297, 299). The proprietary technology as well as the machinery and key personnel used by Structural Europe to manufacture the TR–140 filter came from Essef Corporation. (Tr. 355–58, 361–62). Thus, there is no manifest injustice in holding that Essef Corporation and Pac–Fab, having failed to raise specific grounds for judgment as a matter of law prior to the verdict, are now precluded from doing so.[9]

---

**8.** The Essef Defendants rely on *Ebker v. Tan Jay International, Ltd.,* 739 F.2d 812 (2d Cir. 1984), for the proposition that a court has substantial discretion to relieve a party of the consequences of its failure to raise a claim in its initial motion for judgment as a matter of law. (Essef Defendants' Reply Memorandum in Further Support of Their Post–Trial Motions at 5). That reliance is misplaced. *Ebker* dealt with the situation where a defendant moves for a directed verdict at the close of the plaintiff's case but fails to renew the motion at the close of all the evidence. *Id.* at 823. In the instant case, the Essef Defendants

failed to include an argument regarding the separate liability of Essef Corporation and Pac–Fab in any pre-verdict motion.

**9.** The plaintiffs also argue that the Essef Defendants have waived a number of their other arguments by failing to raise them in their pre-verdict motion. In these other instances it is a closer question whether the pre-verdict motion fairly encompassed the arguments now raised, and I will therefore address them on the merits.

### F. *Punitive Damages*

The Essef Defendants challenge the jury's award of punitive damages on the grounds that such damages are not available in admiralty and, even if they are, they are not warranted by the facts of this case. I previously determined in the course of this litigation that punitive damages may indeed be granted in maritime cases, *Horizon Cruises Litigation*, 101 F.Supp.2d at 210–14, and I will not reiterate that reasoning here.

Punitive damages may be awarded where a defendant's conduct is intentional, wanton and reckless, or constitutes gross negligence. *See CEH, Inc. v. F/V Seafarer*, 70 F.3d 694, 699 (1st Cir. 1995); *Gamma–10 Plastics, Inc. v. American President Lines, Ltd.*, 32 F.3d 1244, 1254 (8th Cir.1994); *Gravatt v. City of New York*, 53 F.Supp.2d 388, 425–26 (S.D.N.Y.1999), *rev'd on other grounds*, 226 F.3d 108 (2d Cir.2000), *cert. denied*, — U.S. ——, 121 S.Ct. 1485, 149 L.Ed.2d 373 (2001). In this case there was evidence from which the jury could conclude (1) that the Essef Defendants were aware that whirlpool spas presented increased risk of illness, including Legionnaires' Disease, (2) that they also knew that the TR–140 filter had problems with channeling and did not backwash properly, thus allowing a build-up of organic materials and preventing disinfectant chemicals from reaching all bacteria, and (3) that, despite this knowledge, they nevertheless marketed this filter for use in whirlpool spas, even affixing a sticker that falsely represented that the filter met the standards of the National Sanitation Foundation. Such conduct is sufficiently wanton to merit an award of punitive damages.

Finally, the Essef Defendants argue that the jury's award of $7 million in punitive damages—$4.2 million of which is allocated to the Passenger Plaintiffs—is excessive. In *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court identified three sets of factors relevant to a determination of whether a punitive damage award is so grossly excessive as to violate the Due Process Clause of the Fourteenth Amendment: (1) the degree of reprehensibility of the tortfeasor's conduct, (2) the ratio of the punitive damages award to the actual harm inflicted, and (3) the relation between the exemplary damages and civil or criminal penalties that could be imposed for comparable misconduct. *Id.* at 575–85, 116 S.Ct. 1589.

In this case, the conduct of the Essef Defendants was sufficiently blameworthy to justify an award of punitive damages. In *Gore*, the Court found none of the aggravating factors associated with reprehensible conduct to be present. The harm inflicted was purely economic and the tortfeasor's conduct "evinced no indifference to or reckless disregard for the health and safety of others." *Id.* at 576, 116 S.Ct. 1589. Further, the Court found that the defendant there had not engaged in repeated tortious acts and had made no deliberate false statements. *Id.* at 576–80, 116 S.Ct. 1589. Here, by contrast, the Essef Defendants put the health of persons who used the spa in jeopardy, actually caused some to contract a serious illness, falsely represented that the filter was approved by the National Sanitation Foundation, and continued to market it in that fashion until well after the outbreak on the Horizon. (Deposition of Ronald Robol dated May 19, 1999, at 995–98, attached as Exh. 4 to Jacobs Decl.).

The ratio of punitive to compensatory damages also supports the award in this case. The punitive award that was overturned in *Gore* was 500 times the actual economic damages. *Id.* at 582, 116 S.Ct.

1589. Here, the Silivanch plaintiffs alone were awarded $2.6 million in compensatory damages. Thus, the entire punitive damage award of $7 million is less than three times that amount. Moreover, only $4.2 million of that will go to the Passenger Plaintiffs, and it will be shared among them. Accordingly, the ratio of punitive to compensatory damages for any single plaintiff will be even less.

None of the parties have suggested what civil or criminal penalties might be available for conduct similar to that engaged in by the Essef Defendants, and so this factor is neutral. Based on the first two *Gore* factors, however, it is clear that the punitive damage award here is not excessive.

### G. *Loss of Society*

 The Essef Defendants as well as Celebrity also attack the jury's award of $300,000 to Joyce Silivanch for loss of society. As with punitive damages, they argue that such damages are not available in admiralty. That contention is foreclosed by decisions of the Second Circuit. *See Zicherman v. Korean Air Lines Co.*, 43 F.3d 18, 21–22 (2d Cir.1994), *aff'd in part and rev'd in part on other grounds*, 516 U.S. 217, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996); *In re Air Disaster at Lockerbie Scotland on December 21, 1988*, 37 F.3d 804, 829 (2d Cir.1994).

 The Essef Defendants further argue that no award is appropriate since Mrs. Silivanch did not suffer pecuniary harm because she did not hire anyone to perform the household services that Mr. Silivanch was no longer capable of undertaking. But loss of society damages compensate for the loss of "a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection." *Sea–Land Services, Inc.*

*v. Gaudet*, 414 U.S. 573, 585, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974) (footnote omitted). Thus, the failure to prove monetary loss does not preclude a plaintiff from receiving an award for loss of services. *See Wartman v. Commodore Cruise Line, Ltd.*, No. 94 Civ. 4155, slip op. at 9–10 (S.D.N.Y. Aug. 3, 1995), *aff'd mem.*, 100 F.3d 943 (2d Cir.1996); *see also Mono v. Peter Pan Bus Lines, Inc.*, 13 F.Supp.2d 471, 480 (S.D.N.Y.1998) ("No court has held that recovery for lost services in a wrongful death action requires that the plaintiff actually hire someone to perform the decedent's services.").

Here, there was ample evidence that because of his brain injury John Silivanch can no longer provide either the love and companionship or the physical assistance to his wife that he did before he contracted Legionnaires' Disease. (Tr. 2815–17, 2870–71, 2905–08, 3203–04). Thus, there is no basis for overturning the jury's award for loss of society.

### H. *Compensatory Damages*

#### 1. *Proximate Cause*

 The Essef Defendants mount a series of attacks on the damage award to Mr. Silivanch, the first being that the plaintiffs failed to demonstrate a causal relationship between Legionnaires' Disease and his brain injury. There is substantial evidence that Mr. Silivanch exhibited neurological deficits after the cruise aboard the Horizon. His treating psychiatrist and a neuropsychologist, who both performed cognitive function tests on him, as well as his treating physician and a clinical social worker, all testified to the plaintiff's diminished mental capacity. (Tr. 2798–2801, 2825–28, 2997–3023, 3053–57, 3227–28, 3243–44). More important for present purposes, Dr. David J. Dickoff, a

clinical neurologist, testified about the relationship between Legionnaires' Disease and such symptoms. He stated that studies indicate that about one-third of the patients who survive Legionnaires' Disease suffer from acute or chronic encephalopathy, that is, disease of the brain. (Tr. 3384–86, 3402, 3404). Dr. Dickoff acknowledged that the etiology of this relationship is a matter of uncertainty. Some physicians believe that the injury is caused directly by toxins released by the Legionella bacteria, while others surmise that it results from an autoimmune reaction to these microorganisms. (Tr. 3391, 3401). In addition, a pneumonia like Legionnaires' Disease can cause hypoxia—reduced blood oxygen—and consequent brain damage, though hypoxia was not documented in Mr. Silivanch's case. (Tr. 3391–92). However, debate concerning the precise biological mechanism at play does not undercut the general agreement in the scientific community concerning the causal connection between Legionnaires' Disease and encephalopathy. And, based on his examination of Mr. Silivanch, his review of the plaintiff's medical records, and his familiarity with the scientific literature, Dr. Dickoff concluded that Mr. Silivanch's brain injury and cognitive deficits were caused by Legionnaires' Disease. (Tr. 3387–90).

■ Nevertheless, the Essef Defendants argue that this evidence was insufficient to prove causation. First, they contend that the plaintiffs' experts were obligated to follow a protocol of differential diagnosis, that is, ruling out other possible causes of Mr. Silivanch's brain injury and ruling in Legionnaires' Disease. While a useful analytical tool, differential diagnosis is not a legal prerequisite for proving causation. In this case, there was nothing in Mr. Silivanch's medical history or records that suggested a

potential alternative cause for his injury, nor have the defendants suggested such a factor.

Next, the Essef Defendants contend that causation is not proven unless Mr. Silivanch can demonstrate that contracting Legionnaires' Disease doubled the likelihood that he would exhibit cognitive deficits. But the Second Circuit has specifically rejected such a mechanical approach to causation. *See In re Joint Eastern & Southern District Asbestos Litigation,* 52 F.3d 1124, 1128, 1134 (2d Cir.1995).

The Essef Defendants also argue that the plaintiffs improperly relied on case reports to prove causation. But such data are plainly relevant to an expert's opinion as to whether a given risk factor is generally associated with an injury. *See Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1228 (9th Cir.1998); *Jennings v. Baxter Healthcare Corp.,* 331 Or. 285, 303–09, 14 P.3d 596, 606–09 (2000); *State v. Smith,* 262 N.J.Super. 487, 521, 621 A.2d 493, 511 (App.Div.1993).

Finally, the Essef Defendants again complain that the plaintiffs rely on the false principle of *post hoc, ergo propter hoc.* Again, however, there was evidence of causation beyond merely a temporal proximity between Mr. Silivanch's contracting Legionnaire's Disease and his exhibiting symptoms of cognitive disfunction.

### 2. *Medical Expenses*

■ The Essef Defendants challenge the awards of past and future medical expenses to Mr. Silivanch. As to past expenses, they argue that the plaintiffs failed to establish that the charges of the service providers were customary and reasonable and that the plaintiffs improperly relied on hearsay testimony. Neither argument is persuasive. Dr. Eric London, a psychiatrist, testified to the reasonableness of the medical expenses incurred by Mr.

Silivanch as a result of his brain injury.[10] (Tr. 3232–33). Although this evidence was limited, the defendants offered nothing to contradict it, and the jury was entitled to give it credence. Dr. London also testified to the charges imposed for services performed by others. (Tr. 3232–33). However, the Essef Defendants did not raise a hearsay objection at trial, nor did they dispute the accuracy of Dr. London's testimony. Accordingly, they have waived any objection to this evidence.

■ The Essef Defendants further argue that there was no adequate evidentiary basis for the jury's award of future medical expenses. However, there was testimony regarding the psychiatric and rehabilitative services that Mr. Silivanch received up to the date of trial. There was also substantial evidence that he was unlikely to improve over time. (Tr. 3028, 3233). Nevertheless, the Essef Defendants argue that because this testimony came, at least in part, from Dr. Beth Caton, a neuropsychologist who did not treat the plaintiff, it is insufficient. However, there is no requirement that evidence supporting future medical expenses must come only from a treating physician. *See Moulton v. Rival Co.*, 116 F.3d 22, 27 (1st Cir.1997) (jury entitled to credit testimony of rehabilitation expert regarding future expenses over that of treating physician). Accordingly, the jury's verdict was fully supported by the evidence.

### 3. *Future Earnings*

■ Next, the Essef Defendants attack the jury's award for loss of future earnings. They argue that there was insufficient proof that Mr. Silivanch is unemployable, and they assert that the pension and social security payments that he will receive should be deducted from the award.

There was ample evidence, however, of Mr. Silivanch's inability to work. Daniel Zietchick, a clinical social worker who treated the plaintiff, testified that not only was Mr. Silivanch terminated from his prior job, but, because of his loss of mental function, he was unable to pursue other work. (Tr. 2820–22). Similarly, Marie Barry, the plaintiff's rehabilitation counselor, testified that although the goal of the therapy she provided had initially been to prepare the plaintiff to return to work, she ultimately concluded that he could not maintain competitive employment and that his status in that respect was unlikely to improve. (Tr. 3087–90). Finally, Dr. Caton, the neuropsychologist, also testified that Mr. Silivanch was incapable of working. (Tr. 3024). The jury could fairly credit this evidence over that offered by the defendants.

■ Whether the jury should have deducted pension and social security benefits turns on the collateral source rule. The collateral source doctrine generally precludes benefits received from third-parties from being considered in determining the amount of damages. *See Turnbull v. USAir, Inc.*, 133 F.3d 184, 186 (2d Cir. 1998). It is fully applicable in admiralty cases such as this. *See A/H Battery Associates v. Gulf Craft, Inc.*, No. 93 CIV 1915, 1998 WL 252105, at *1 (S.D.N.Y. May 18, 1998); *Stanley v. Bertram–Trojan, Inc.*, 868 F.Supp. 541, 543 (S.D.N.Y.1994). Furthermore, both pension and social security benefits are considered collateral source payments. *See Clausen v. Sea–3, Inc.*, 21 F.3d 1181, 1192–93 (1st Cir.1994) (disability benefits and social security); *In re Adventure Bound Sports, Inc.*, 858 F.Supp.

---

**10.** In an excess of modesty, Dr. London testified that he "hoped" his own fees were customary and reasonable. (Tr. 3233). It is clear in context that he was affirming the reasonableness of these charges.

1192, 1208–09 (S.D.Ga.1994) (social security); *Olsen v. City of New York*, No. 83 CIV. 0462, 1984 WL 1033, at *2 (S.D.N.Y. Oct. 18, 1984) (pension). Therefore, the jury in this case properly declined to deduct such payments from its award for the loss of future earnings.

### 4. *Pain and Suffering*

Finally, the Essef Defendants argue that the jury's award of $900,000 to Mr. Silivanch for pain and suffering was excessive and merits an order of remittitur. A court can order remittitur requiring a plaintiff to choose between a reduced damage award and a new trial in two circumstances:

> (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, ... and (2) more generally, where the award is "intrinsically excessive" in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.

*Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984) (citations omitted). The Essef Defendants have not identified any specific quantifiable error in the jury's award of damages for pain and suffering, and I find none. Thus, the verdict can be set aside only if it is "so high as to shock the judicial conscience and constitute a denial of justice." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (citations and quotations omitted).

In support of their claim of excessiveness, the Essef Defendants point to two segments of the plaintiff's testimony: where he stated that, for the most part, he had no memory of his hospitalization, and where, according to the defendants, he acknowledged finding pleasure in daily activities. This evidence, however, hardly minimizes Mr. Silivanch's suffering.

First, he had no memory of pain or discomfort at the hospital precisely because his brain injury disrupted his mental processes. He does recall having vivid hallucinations while he was hospitalized, and in his state of delirium he pulled intravenous tubes from his arm and left the hospital against medical advice. (Tr. 3186–89). Even though a plaintiff does not have a specific memory of pain, he may be compensated for his suffering based on objective evidence. *See Stratis v. Eastern Air Lines, Inc.*, 682 F.2d 406, 414–15 (2d Cir.1982).

Moreover, "a more flexible definition of pain and suffering must be used" where a plaintiff has suffered brain damage. *Hoskie v. United States*, 666 F.2d 1353, 1358 (10th Cir.1981). "[T]he compensable pain and suffering from injuries to the brain extends far beyond that suffered at the time the initial injury occurs." *Id.* It includes the loss of capacity for mental development and the daily frustrations of loss of mental function. *Id.*

Nevertheless, the Essef Defendants contend that the impact on Mr. Silivanch's life has been minimal as evinced by his statement that "I can sit and watch the grass grow and it wouldn't bother me." (Tr. 3190). However, the defendants have seriously mischaracterized the plaintiff's testimony by plucking a single sentence from his description of his current state of mind. When his attorney asked him if events are still confused in his mind as they were when he was in the hospital, Mr. Silivanch replied:

> Some of it, and some of it is not. It's just—it's that my time span is completely gone, time is gone. It's weird, the whole thing is weird. My time is—it's like—I can explain it, but I can't. Joyce

can't understand, she can't understand the time, and a minute to me is an—an hour is like a minute. I can sit and watch the grass grow and it wouldn't bother me. It wouldn't bother me at all. I say that, I don't even know where I'm going now.

(Tr. 3189–90). As is clear from this passage, the plaintiff was struggling to describe his disorientation with respect to time, not stating that he enjoyed day-to-day activities.

John Silivanch suffered brain damage that has rendered him unemployable, impairs his social relationships, disrupts his orientation as to time and place, and inhibits his ability to learn. His condition is permanent and is unlikely to improve. In light of this evidence, the jury's award was not excessive.

## I. *Prejudgment Interest*

Next, the Essef Defendants and Celebrity challenge the Court's award of prejudgment interest. I previously rejected their arguments on this issue in my Memorandum and Order dated August 25, 2000, *Silivanch v. Celebrity Cruises, Inc.,* No. 95 Civ. 0374, 2000 WL 1211578, at **1–3 (S.D.N.Y. Aug. 25, 2000), and there is no need to reiterate that reasoning here.

## J. *Evidentiary and Procedural Issues*

### 1. *Expert Testimony*

The Essef Defendants raise a series of evidentiary and procedural claims that they contend should entitle them to a new trial. The first is that I should have precluded as unreliable the expert testimony of Steven Suchanek and Dr. Gregory Zachrich. The threshold question on this issue is whether the Essef Defendants have waived any objections to the admissibility of that testimony. Celebrity, relying on *Frederick v. Kirby Tankships, Inc.,* 205

F.3d 1277, 1286 (11th Cir.), *cert. denied,* 531 U.S. 813, 121 S.Ct. 46, 148 L.Ed.2d 16 (2000), *Judd v. Rodman,* 105 F.3d 1339, 1342 (11th Cir.1997), and *Collins v. Wayne Corp.,* 621 F.2d 777, 784 (5th Cir.1980), argues that although the Essef Defendants presented their arguments in motions *in limine,* they forfeited their objections by failing to renew them at trial.

It appears, however, that the Second Circuit takes a more lenient view of waiver.

[A] motion *in limine* may preserve an objection when the issue (1) is fairly presented to the district court, (2) is the type of issue that can be finally decided in a pre-trial hearing, and (3) is ruled upon without equivocation by the trial judge.

*United States v. Yu–Leung,* 51 F.3d 1116, 1121 (2d Cir.1995) (quoting *United States v. Mejia–Alarcon,* 995 F.2d 982, 986 (10th Cir.1993)); *see also United States v. McDermott,* 245 F.3d 133, 140 n. 3 (2d Cir.2001). In this case, the Essef Defendants made pretrial motions to exclude the testimony of Mr. Suchanek and Dr. Zachrich on the ground that it was scientifically unsound; these motions were susceptible to a determination prior to trial since the experts had submitted reports and been deposed; and in fact I denied the motions on the record. (Tr. 652–53). Accordingly, the Essef Defendants did not need to raise these issues again at trial in order to preserve their objections.

Turning to the merits, Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may

testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Under this rule, "[t]horny problems of admissibility arise when an expert seeks to base his opinion on novel or unorthodox techniques that have yet to stand the tests of time to prove their validity." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir.1995). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court reaffirmed the role of the trial courts in dealing with these problems, holding that the judge should make a "preliminary assessment of whether the reasoning or methodology underlying the [proffered expert] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. The Court went on to identify four factors relevant to this analysis: whether the expert's theory or technique has been tested, whether it has been subjected to peer review and publication, whether the potential rate of error is significant, and whether it has received general acceptance in the scientific community. *Id.* at 593–94.

■ Subsequently, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court confirmed that a trial judge should play this "gatekeeper" function not only with respect to scientific evidence, but with respect to the testimony of any expert, including those whose expertise derives from personal knowledge and experience. *Id.* at 149–50, 119 S.Ct. 1167. However, the Court also emphasized that the factors identified in *Daubert* were merely illustrative, and other considerations might be more pertinent in assessing the reliability of expert evidence in any particular case. *Id.* at 150–51, 119 S.Ct. 1167.

In construing *Daubert*, the Second Circuit has emphasized the discretion of the trial court:

First, . . . *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence. Second, it emphasizes the need for flexibility in assessing whether evidence is admissible. Rather than using rigid "safeguards" for determining whether testimony should be admitted, the Court's approach is to permit the trial judge to weigh the various considerations pertinent to the issue in question. Third, *Daubert* allows for the admissibility of scientific evidence, even if not generally accepted in the relevant scientific community, provided its reliability has independent support. Finally, the Court expressed its faith in the power of the adversary system to test "shaky but admissible" evidence, and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable.

*Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir.1995) (citation omitted).

■ In this case, both challenged witnesses survive the *Daubert* test. Mr. Suchanek received a Bachelor of Science degree in industrial technology from the University of Wisconsin. (Tr. 1337). As director of operations for Essef Corporation (then known as Structural Fibers, Inc.), he designed and tested hub and lateral systems for high-rate sand filters. (Tr. 1358–64). Thus, he had the training and experience to testify about filter design and performance generally.

The Essef Defendants object to his testimony concerning a test he conducted on the TR–140 filter using diatomaceous earth ("DE"), a powdery substance. In preparing the filter for this test, he first removed all of the filter sand down to the gravel bed. He then installed three inches of sand, followed by a layer of DE three-

eighths of an inch thick. He repeated this process until he had a series of alternating layers of sand and DE. (Tr. 1395). Mr. Suchanek then filled the tank with water and ran the system in filtration mode for several hours to simulate normal use. (Tr. 1395–96). Thereafter, the test consisted of running a backwash cycle and observing the results. (Tr. 1396–97). After backwash, Mr. Suchanek saw through a window in the side of the tank that the layers of DE at the edge were undisturbed. (Tr. 1396). However, a layer of DE had now been deposited on top of the filter medium. (Tr. 1396). From this, Mr. Suchanek deduced that coring was occurring: during backwash, the water flow was being funneled through the center of the filter and was not washing the sand toward the outside of the tank. (Tr. 1397). He also took core samples to confirm his initial observations. (Tr. 1397–99). Mr. Suchanek then repeated the experiment, but instead of taking core samples, he physically removed each layer in sequence. (Tr. 1402). Again, he found coring. (Tr. 1402).

The Essef Defendants object that this test is entirely novel and has never been validated. Certainly, there is no evidence that Mr. Suchanek's specific methodology has been tested, subjected to peer review, or widely accepted in the scientific community. But the critical question is whether it is sufficiently reliable to be admissible. *See Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167. In essence, Mr. Suchanek's protocol consisted primarily of observing the operation of the very device at issue. He introduced one additional element—the DE—so that the functioning of the filter could be visualized. The Essef Defendants have presented no evidence that this alteration in any way affects the normal operation of the filter or provides a misleading view of its performance. *Daubert* does not hold that every time an expert witness adopts some variation of a well-established method, his evidence will be excluded unless that variation itself has been scientifically validated. Indeed, with respect to one of the *Daubert* factors, the Supreme Court observed that "[s]ome propositions, moreover, are too particular, too new, or of too limited interest to be published." *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786. That is the case here; the aspect of Mr. Suchanek's testing that is challenged by the Essef Defendants is too narrow for it to have been subjected to the scrutiny of the scientific community. Finally, even if Mr. Suchanek's tests were not adequately validated, their admission caused no substantial prejudice, since the results were consistent with other evidence that the TR–140 filter had a coring problem. For example, while Mr. Suchanek was employed by Essef Corporation, he performed dye tests that showed that the flow of water in the TR–140 during backwash was concentrated in the center of the tank. (Tr. 1361–62). He testified without contradiction that such dye tests are common in the industry. (Tr. 1362).

■■■■■ The Essef Defendants also attack a computer model designed by Dr. Gregory Zachrich. According to Dr. Zachrich, his model showed that the flow of water in a TR–140 filter operating in backwash mode was not uniform; rather, there was greater flow in the center core than at the periphery. (Tr. 1223–24). The Essef Defendants complain that this model incorporated inappropriate assumptions, the most significant being that the flow of water in the filter was laminar rather than turbulent. In other words, the model generated calculations based on the smooth flow of water, as if no sand or other filter medium were present. If this aspect of Dr. Zachrich's testimony had been intended to present a complete picture of the filter in actual operation, then the Essef Defendants' argument might have some

merit. However, counsel made it clear that his questioning dealt only with the general flow characteristics of water alone within the filter. (Tr. 1223). As such, the model was scientifically valid, even if the point that it was designed to illustrate was limited. Generally, arguments that the assumptions relied on by an expert are unfounded go to the weight rather than the admissibility of the evidence. *See Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996). Here, it is telling that counsel for the Essef Defendants asked Dr. Zachrich only two questions about his computer model, neither of which related to the underlying assumptions. (Tr. 1258–59).

In sum, the challenges raised by the Essef Defendants to the expert testimony are arguments that were or could have been developed on cross-examination and otherwise presented to the jury. They did not warrant exclusion of the evidence under *Daubert* and its progeny.

### 2. Destruction of Evidence

■ The Essef Defendants next argue that they are entitled to a new trial because I denied their application for an instruction allowing the jury to draw an adverse inference against Celebrity based on its destruction of the TR–140 filters at issue. Celebrity was clearly under an obligation to preserve the filters, since it had constructive notice that litigation would likely be commenced concerning the outbreak of an illness that had been traced to them. *See Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998) (obligation to preserve arises "when a party should have known that the evidence may be relevant to future litigation"); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 73 (S.D.N.Y.1991) (same). Whether its failure to do so warranted an adverse inference charge depends upon the severity of the wrongdoing and the prejudice to the adversary. *See Byrnie v. Town of Cromwell, Board of Education*, 243 F.3d 93, 107–08 (2d Cir.2001); *Kronisch*, 150 F.3d at 127–28; *Shaffer v. RWP Group, Inc.*, 169 F.R.D. 19, 25–27 (E.D.N.Y.1996).

■ In this case, Celebrity removed the filters from the machinery room where they were located on the Horizon after they had been identified as a source of Legionella bacteria and while the vessel was en route to a shipyard to undergo remedial sanitation procedures. To accomplish this, the ship's crew first removed the sand from the filters and stored it. (Deposition of Spiros Mendrinos dated March 6, 1997 ("Mendrinos Dep."), at 100–01, attached as Exh. D to Celebrity's Memorandum in Opposition to Essef's Motion In Limine Tailored to Celebrity's Alleged Spoliation of Evidence ("Celebrity Spoliation Memo")). They then removed the internal components and cut the filters into pieces to facilitate fitting them through the door of the machinery room. (Tr. 905–06, 1944–45, 2329–30). The sections of the filters, the components, and the sand were then made available for inspection and were photographed by the Essef Defendants in October 1996 in New York City. (Affidavit of John F. Keating dated April 26, 2000, ¶¶ 4, 5, attached as Exh. A to Celebrity Spoliation Memo.). Approximately two years later, Celebrity attempted to locate the filters and discovered that they had been lost, probably in the course of transferring them to a warehouse in Miami. (Celebrity Spoliation Memo. at 4).

In light of these facts, an adverse inference charge would not have been appropriate. The loss of the evidence was not intentional: the initial cutting of the filters was done in the course of removing them from the ship and their subsequent disappearance was the result of what, at worst,

could be characterized as negligence. The Essef Defendants make much of the fact that the chief engineer ordered the crew to "destroy" the filters. (Tr. 904). But this officer, whose first language was apparently not English, clearly did not mean that the filters should be rendered unavailable since, in fact, they were preserved.

Nor have the Essef Defendants demonstrated substantial prejudice. To be sure, their expert would like to have been able to manipulate the internal components of the filters. However, he was able to provide support for the Essef Defendants' theory based on his review of photographs of the filters and their parts. (Tr.2095–101). Moreover, nothing prevented the Essef Defendants from including an expert in their inspection team at the time that the filters were made available.

The refusal to give an adverse inference charge is therefore no basis for a new trial in this case.

### 3. *Order of Summation*

■ Finally, the Essef Defendants complain that during summations they were not provided an opportunity for rebuttal. The local civil rules of this court give discretion to the trial judge to determine the order of summation. Rule 39.2 of the Local Civil Rules for the Southern and Eastern Districts of New York. In practice, this most often means that the defendant goes first and the plaintiff, as the party with the burden of proof, goes last. That was the procedure followed here, with the Essef Defendants closing first, followed by Celebrity and then the plaintiffs. It is conceivable that a trial judge might commit an abuse of discretion by refusing to deviate from this pattern in a case where the party with the final word raises an argument that could not have been anticipated. But that was not the case here. At the close of the summations

the Essef Defendants did not identify any novel legal argument or misstatement of the record that they should have been allowed to address. (Tr. 2473). Now, even with the benefit of having reviewed the written transcript, they have not articulated any prejudice. Accordingly, a new trial is not warranted.

### K. *Celebrity's Claims*

The Essef Defendants raise two posttrial arguments unique to the claims asserted against them by Celebrity. First, they maintain that Celebrity's products liability claims are barred by the economic loss doctrine, and, second, they contend that they are entitled to judgment as a matter of law or a new trial on Celebrity's fraud claim.

### 1. *Economic Loss Doctrine*

■■■ In *East River Steamship*, the Supreme Court incorporated the economic loss doctrine into admiralty law, holding that "a manufacturer in a commercial relationship has no duty under either a negligence or a strict products-liability theory to prevent a product from injuring itself." *East River Steamship*, 476 U.S. at 871, 106 S.Ct. 2295. In that case, the Court determined that a vessel owner could not assert tort claims against the manufacturer of turbines that malfunctioned after they had been installed in the plaintiff's ships. Here, the Essef Defendants claim that Celebrity is likewise precluded from asserting products liability claims against it in connection with the TR–140 filters.

■ This argument must be rejected for two reasons. First, it has been waived. It was not raised prior to trial; it was not asserted at the close of Celebrity's case; and it was not advanced in the Essef Defendants' pre-verdict motion for judgment as a matter of law.

Second, it fails on the merits. The economic loss doctrine as articulated in *East River Steamship* only barred tort recovery for damage to the allegedly defective product itself. It does not preclude recovery in tort for damage caused by the defective product to "other property." *Id.* at 867, 106 S.Ct. 2295; *see also Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 876–77, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997); *Transco Syndicate # 1, Ltd. v. Bollinger Shipyards, Inc.*, 1 F.Supp.2d 608, 610–11 (E.D.La.1998). Nor does it prevent a tort action where the product itself causes or threatens harm to persons, even if the plaintiff is a purchaser of the product and not one of the injured individuals. *See Tioga Public School District # 15 v. United States Gypsum Co.*, 984 F.2d 915, 918 (8th Cir.1993); *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975, 977–78 (4th Cir.1987).

Here, the TR–140 filters caused harm to "other property" in that they contaminated the water throughout the whirlpool spa system on the Horizon. *See Tioga Public School District*, 984 F.2d at 918 (injury caused by asbestos was contamination of building and health risk to building's occupants); *City of Greenville*, 827 F.2d at 977–78 (same). And, of course, they caused harm to the passengers who contracted Legionnaires' Disease. Thus, Celebrity's tort claims are not barred by the economic loss doctrine.

2. *Fraud*

The Essef Defendants concede that they falsely represented that the TR–140 filter had been certified by the NSF. However, they argue that Celebrity's fraud claim fails for lack of proof with respect to three necessary elements: materiality, intent, and causation.

The Essef Defendants contend that their claim of NSF certification was not material because no filter, including the TR–140, is intended to screen out pathogens such as Legionella bacteria. This argument confuses materiality with causation. "In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it is addressed." *Neder v. United States*, 527 U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (citations, internal quotations, and alterations omitted); *see also Moore v. PaineWebber, Inc.*, 189 F.3d 165, 170 (2d Cir.1999) ("A misrepresentation is material to a fraud claim only if it is the type of misrepresentation likely to be deemed significant to a reasonable person considering whether to enter into the transaction."). The question here is whether there is evidence that a vessel owner like Celebrity would be influenced in its choice of spa components by a representation that they are NSF certified.

There is, indeed, such proof in the record. Celebrity's contract with Meyer Werft, the shipyard that built the Horizon, specifically required that the vessel comply with the regulations or recommendations of the United States Public Health Service ("the USPHS"). (Pl.Exh. 96). The USPHS, in turn, recommended that public spas be equipped with filters that met NSF standards. (Pl.Exh. 100). Moreover, the trial witness for Meyer Werft confirmed that his company utilized only NSF-approved components in order to comply with USPHS recommendations. (Tr. 668–69).[11] There was thus adequate evidence of materiality.

---

11. The Essef Defendants presented proof that some other components of the spa system on the Horizon were not NSF certified. (Tr. 2083, 2093–94). It was for the jury to decide, however, whether that wholly undermined the evidence that NSF approval was material.

 The Essef Defendants next argue that there was no proof of deceptive intent because they never communicated directly with Celebrity regarding certification of the filters. But, as discussed more fully in my Memorandum and Order dated June 24, 1999, which granted Celebrity's motion to assert fraud claims, where a defendant makes a false statement to a third party acting as a proxy for the plaintiff, the plaintiff may assert a fraud claim directly against that defendant. *See Union Carbide Corp. v. Montell N.V.,* 9 F.Supp.2d 405, 412–13 (S.D.N.Y.1998). The element of fraudulent intent is satisfied if there is proof that the defendant intended or had reason to expect that the substance of the false statement would be communicated to the plaintiff. *See Turtur v. Rothschild Registry International, Inc.,* 26 F.3d 304, 311 (2d Cir.1994). That was the case here. The Essef Defendants labeled the TR–140 filter as being NSF-approved precisely because of the marketing advantages such certification provides. (Tr. 685–88). And, of course, the party that would ultimately base a purchasing decision on NSF approval would be the vessel owner, Celebrity. Indeed, Celebrity's vice president of engineering testified that the shipyard selected components for the spa system and submitted its choices to Celebrity for approval. (Tr. 1434). It could therefore have been reasonably anticipated that representations made to Meyer Werft concerning the TR–140 filter would be conveyed to Celebrity. This nexus is sufficiently close for purposes of establishing intent to deceive.

 The Essef Defendants' causation argument also fails. They contend that there is neither proof that Celebrity would have rejected the TR–140 filter had it known it was not NSF-certified, nor evidence that Celebrity considered the filter relevant to preventing Legionnaires'

Disease. The first point goes to transaction causation, the second to loss causation. There is ample proof of transaction causation. As noted above, Celebrity's contact with Meyer Werft required the use of USPHS-recommended (and, by implication, NSF-certified) components. There is also sufficient evidence of loss causation. Certainly it is necessary that there be a link between the nature of the misrepresentation and the injuries suffered. For example, if NSF certification had been denied only because the filter was prone to explode, then the false statement that it was NSF-approved would not be causally connected to damages flowing from the outbreak of disease. But here the failure of the TR–140 filter to meet NSF standards reflected in part its inability to clean the filter medium thoroughly during backwashing. (Tr. 1703–07). As discussed above, there was evidence that this deficiency allowed the proliferation of bacteria and ultimately the outbreak of Legionnaires' Disease.

*Conclusion*

For the reasons set forth above, the Essef Defendants' motion for judgment as a matter of law is granted to the extent that the Passenger Plaintiffs' claim for breach of express warranty is dismissed. In all other respects, the motions of the Essef Defendants and of Celebrity for judgment as a matter of law or for a new trial are denied.

SO ORDERED.